John A. MORAN and the Dyson-Kissner-Moran Corporation, Plaintiffs Below-Appellants,

and

Gretl Golter, individually and in a derivative capacity, Plaintiff Intervenor Below-Appellant,

v.

HOUSEHOLD INTERNATIONAL, INC., a Delaware Corporation, Donald C. Clark, Thomas D. Flynn, Mary Johnston Evans, William D. Hendry, Joseph W. James, Mitchell P. Kartalia, Gordon P. Osler, Arthur E. Rasmussen, George W. Rauch, James M. Tait, Miller Upton, Bernard F. Brennan and Gary G. Dillon, Defendants Below-Appellees.

Supreme Court of Delaware.
Submitted: May 21, 1985.
Decided: Nov. 19, 1985.
As Amended: Nov. 20, 1985.

Irving S. Shapiro (argued), Rodman Ward, Jr., Stuart L. Shapiro, Stephen P. Lamb, Thomas J. Allingham II and Andrew J. Turezyn of Skadden, Arps, Slate, Meagher & Flom, Wilmington, and Michael W. Mitchell, Jeffrey Glekel, Jeremy A. Berman and Joseph A. Guglielmelli of Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiffs below-appellants.

Joseph A. Rosenthal and Norman M. Monhait of Morris and Rosenthal, P.A., Wilmington, and Marshall Patner of Orlikoff, Flamm and Patner, Chicago, Frederick Brace of Brace & O'Donnell, and Geoffrey P. Miller (argued), Chicago, Ill., of counsel, for plaintiff intervenor below-appellant.

Charles E. Richards, Jr. (argued), Donald A. Bussard, Jesse A. Finkelstein, and Gregory P. Williams of Richards, Layton & Finger, Wilmington, and George A. Katz, William C. Sterling, Jr., Michael W. Schwartz, Eric M. Roth, Warren R. Stern and Karen B. Shaer of Wachtell, Lipton, Rosen & Katz, New York City, of counsel, for defendants below-appellees.

Lawrence C. Ashby of Ashby, McKelvie & Geddes, Wilmington, Marc P. Cherno, Harvey L. Pitt, Pamela Jarvis of Fried, Frank, Harris, Shriver & Jacobson, New York City, amicus curiae, and Matthew P. Fink, Thomas D. Maher, Investment Co. Institute, Washington, D.C., of counsel, for Investment Co. Institute.

Robert J. Katzenstein and Clark W. Furlow of Lassen, Smith, Katzenstein & Furlow, Wilmington, and Kurt L. Schultz, Columbus R. Gangemi, Jr., Robert F. Wall, Jerome W. Pope of Winston & Strawn, Chicago, Ill., amicus curiae, for the United Food and Commercial Workers Intern. Union.

Joseph J. Farnan, Jr., U.S. Atty., Sue L. Robinson, Asst. U.S. Atty., Wilmington, Del., Daniel L. Goelzer, Jacob H. Stillman, Eric Summergrad, Gerard S. Citera, amicus curiae, and Paul Gonson, of counsel, for Securities and Exchange Com'n, Washington, D.C.

Before CHRISTIE, Chief Justice, and McNEILLY and MOORE, JJ.

McNEILLY, Justice:

This case presents to this Court for review the most recent defensive mechanism in the arsenal of corporate takeover weaponry—the Preferred Share Purchase Rights Plan ("Rights Plan" or "Plan"). The validity of this mechanism has attracted national attention. *Amici curiae* briefs have been filed in support of appellants by the Security and Exchange Commission ("SEC")[1] and the Investment Company Institute. An *amicus curiae* brief has been filed in support of appellees ("Household") by the United Food and Commercial Workers International Union.

In a detailed opinion, the Court of Chancery upheld the Rights Plan as a legitimate exercise of business judgment by Household. *Moran v. Household International, Inc.*, Del.Ch., 490 A.2d 1059 (1985). We agree, and therefore, affirm the judgment below.

## I

The facts giving rise to this case have been carefully delineated in the Court of Chancery's opinion. *Id.* at 1064–69. A review of the basic facts is necessary for a complete understanding of the issues.

On August 14, 1984, the Board of Directors of Household International, Inc. adopted the Rights Plan by a fourteen to two vote.[2] The intricacies of the Rights Plan are contained in a 48-page document entitled "Rights Agreement". Basically, the Plan provides that Household common stockholders are entitled to the issuance of one Right per common share under certain triggering conditions. There are two triggering events that can activate the Rights. The first is the announcement of a tender offer for 30 percent of Household's shares ("30% trigger") and the second is the acquisition of 20 percent of Household's shares by any single entity or group ("20% trigger").

---

**1.** The SEC split 3–2 on whether to intervene in this case. The two dissenting Commissioners have publicly disagreed with the other three as to the merits of the Rights Plan. 17 Securities Regulation & Law Report 400; The Wall Street Journal, March 20, 1985, at 6.

**2.** Household's Board has ten outside directors and six who are members of management. Messrs. Moran (appellant) and Whitehead voted against the Plan. The record reflects that Whitehead voted against the Plan not on its substance but because he thought it was novel and would bring unwanted publicity to Household.

If an announcement of a tender offer for 30 percent of Household's shares is made, the Rights are issued and are immediately exercisable to purchase 1/100 share of new preferred stock for $100 and are redeemable by the Board for $.50 per Right. If 20 percent of Household's shares are acquired by anyone, the Rights are issued and become non-redeemable and are exercisable to purchase 1/100 of a share of preferred. If a Right is not exercised for preferred, and thereafter, a merger or consolidation occurs, the Rights holder can exercise each Right to purchase $200 of the common stock of the tender offeror for $100. This "flip-over" provision of the Rights Plan is at the heart of this controversy.

Household is a diversified holding company with its principal subsidiaries engaged in financial services, transportation and merchandising. HFC, National Car Rental and Vons Grocery are three of its wholly-owned entities.

Household did not adopt its Rights Plan during a battle with a corporate raider, but as a preventive mechanism to ward off future advances. The Vice-Chancellor found that as early as February 1984, Household's management became concerned about the company's vulnerability as a takeover target and began considering amending its charter to render a takeover more difficult. After considering the matter, Household decided not to pursue a fair price amendment.[3]

In the meantime, appellant Moran, one of Household's own Directors and also Chairman of the Dyson-Kissner-Moran Corporation, ("D–K–M") which is the largest single stockholder of Household, began discussions concerning a possible leveraged buy-out of Household by D–K–M. D–K–M's financial studies showed that Household's stock was significantly undervalued in relation to the company's break-up value. It is uncontradicted that Moran's suggestion of a leveraged buy-out never progressed beyond the discussion stage.

Concerned about Household's vulnerability to a raider in light of the current takeover climate, Household secured the services of Wachtell, Lipton, Rosen and Katz ("Wachtell, Lipton") and Goldman, Sachs & Co. ("Goldman, Sachs") to formulate a takeover policy for recommendation to the Household Board at its August 14 meeting. After a July 31 meeting with a Household Board member and a pre-meeting distribution of material on the potential takeover problem and the proposed Rights Plan, the Board met on August 14, 1984.

Representatives of Wachtell, Lipton and Goldman, Sachs attended the August 14 meeting. The minutes reflect that Mr. Lipton explained to the Board that his recommendation of the Plan was based on his understanding that the Board was concerned about the increasing frequency of "bust-up"[4] takeovers, the increasing takeover activity in the financial service industry, such as Leucadia's attempt to take over Arco, and the possible adverse effect this type of activity could have on employees and others concerned with and vital to the continuing successful operation of Household even in the absence of any actual bust-up takeover attempt. Against this factual background, the Plan was approved.

Thereafter, Moran and the company of which he is Chairman, D–K–M, filed this suit. On the eve of trial, Gretl Golter, the holder of 500 shares of Household, was permitted to intervene as an additional plaintiff. The trial was held, and the Court

**3.** A fair price amendment to a corporate charter generally requires supermajority approval for certain business combinations and sets minimum price criteria for mergers. *Moran*, 490 A.2d at 1064, n. 1.

**4.** "Bust-up" takeover generally refers to a situation in which one seeks to finance an acquisition by selling off pieces of the acquired company.

of Chancery ruled in favor of Household.[5] Appellants now appeal from that ruling to this Court.

## II

The primary issue here is the applicability of the business judgment rule as the standard by which the adoption of the Rights Plan should be reviewed. Much of this issue has been decided by our recent decision in *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985). In *Unocal*, we applied the business judgment rule to analyze Unocal's discriminatory self-tender. We explained:

> When a board addresses a pending takeover bid it has an obligation to determine whether the offer is in the best interests of the corporation and its shareholders. In that respect a board's duty is no different from any other responsibility it shoulders, and its decisions should be no less entitled to the respect they otherwise would be accorded in the realm of business judgment.

*Id.* at 954 (citation and footnote omitted).

Other jurisdictions have also applied the business judgment rule to actions by which target companies have sought to forestall takeover activity they considered undesirable. *See Gearhart Industries, Inc. v. Smith International*, 5th Cir., 741 F.2d 707 (1984) (sale of discounted subordinate debentures containing springing warrants); *Treco, Inc. v. Land of Lincoln Savings and Loan*, 7th Cir., 749 F.2d 374 (1984) (amendment to by-laws); *Panter v. Marshall Field*, 7th Cir., 646 F.2d 271 (1981) (acquisitions to create antitrust problems); *Johnson v. Trueblood*, 3d Cir., 629 F.2d 287 (1980), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981) (refusal to

tender); *Crouse-Hinds Co. v. InterNorth, Inc.*, 2d Cir., 634 F.2d 690 (1980) (sale of stock to favored party); *Treadway v. Cane Corp.*, 2d Cir., 638 F.2d 357 (1980) (sale to White Knight), *Enterra Corp. v. SGS Associates*, E.D.Pa., 600 F.Supp. 678 (1985) (standstill agreement); *Buffalo Forge Co. v. Ogden Corp.*, W.D.N.Y., 555 F.Supp. 892, *aff'd*, (2d Cir.) 717 F.2d 757, *cert. denied*, 464 U.S. 1018, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983) (sale of treasury shares and grant of stock option to White Knight); *Whittaker Corp. v. Edgar*, N.D.Ill., 535 F.Supp. 933 (1982) (disposal of valuable assets); *Martin Marietta Corp. v. Bendix Corp.*, D.Md., 549 F.Supp. 623 (1982) (Pac-Man defense).[6]

This case is distinguishable from the ones cited, since here we have a defensive mechanism adopted to ward off possible future advances and not a mechanism adopted in reaction to a specific threat. This distinguishing factor does not result in the Directors losing the protection of the business judgment rule. To the contrary, pre-planning for the contingency of a hostile takeover might reduce the risk that, under the pressure of a takeover bid, management will fail to exercise reasonable judgment. Therefore, in reviewing a pre-planned defensive mechanism it seems even more appropriate to apply the business judgment rule. *See Warner Communications v. Murdoch*, D.Del., 581 F.Supp. 1482, 1491 (1984).

Of course, the business judgment rule can only sustain corporate decision making or transactions that are within the power or authority of the Board. Therefore, before the business judgment rule can be applied it must be determined whether the Directors were authorized to adopt the Rights Plan.

---

5. The Vice-Chancellor did rule in favor of appellants on Household's counterclaim, but that ruling is not at issue in this appeal.

6. The "Pac-Man" defense is generally a target company countering an unwanted tender offer

by making its own tender offer for stock of the would-be acquirer. Block & Miller, *The Responsibilities and Obligations of Corporate Directors in Takeover Contests,* 11 Sec.Reg.L.J. 44, 64 (1983).

## III

Appellants vehemently contend that the Board of Directors was unauthorized to adopt the Rights Plan. First, appellants contend that no provision of the Delaware General Corporation Law authorizes the issuance of such Rights. Secondly, appellants, along with the SEC, contend that the Board is unauthorized to usurp stockholders' rights to receive hostile tender offers. Third, appellants and the SEC also contend that the Board is unauthorized to fundamentally restrict stockholders' rights to conduct a proxy contest. We address each of these contentions in turn.

### A.

While appellants contend that no provision of the Delaware General Corporation Law authorizes the Rights Plan, Household contends that the Rights Plan was issued pursuant to 8 *Del.C.* §§ 151(g) and 157. It explains that the Rights are authorized by § 157 [7] and the issue of preferred stock underlying the Rights is authorized by § 151.[8] Appellants respond by making several attacks upon the authority to issue the Rights pursuant to § 157.

■ Appellants begin by contending that § 157 cannot authorize the Rights Plan since § 157 has never served the purpose of authorizing a takeover defense. Appellants contend that § 157 is a corporate financing statute, and that nothing in its legislative history suggests a purpose that has anything to do with corporate control or a takeover defense. Appellants are unable to demonstrate that the legislature, in its adoption of § 157, meant to limit the applicability of § 157 to only the issuance of Rights for the purposes of corporate financing. Without such affirmative evidence, we decline to impose such a limitation upon the section that the legislature has not. *Compare Providence & Worchester Co. v. Baker*, Del.Supr., 378 A.2d 121, 124 (1977) (refusal to read a bar to protective voting provisions into 8 *Del.C.* § 212(a)).

As we noted in *Unocal:*

[O]ur corporate law is not static. It must grow and develop in response to, indeed in anticipation of, evolving concepts and needs. Merely because the General Corporation Law is silent as to a specific matter does not mean that it is prohibited.

493 A.2d at 957. *See also Cheff v. Mathes*, Del.Supr., 199 A.2d 548 (1964).

Secondly, appellants contend that § 157 does not authorize the issuance of sham rights such as the Rights Plan. They contend that the Rights were designed never to be exercised, and that the Plan has no economic value. In addition, they contend the preferred stock made subject to the Rights is also illusory, citing *Telvest, Inc.*

---

**7.** The power to issue rights to purchase shares is conferred by 8 *Del.C.* § 157 which provides in relevant part:

Subject to any provisions in the certificate of incorporation, every corporation may create and issue, whether or not in connection with the issue and sale of any shares of stock or other securities of the corporation, rights or options entitling the holders thereof to purchase from the corporation any shares of its capital stock of any class or classes, such rights or options to be evidenced by or in such instrument or instruments as shall be approved by the board of directors.

**8.** 8 *Del.C.* § 151(g) provides in relevant part:

When any corporation desires to issue any shares of stock of any class or of any series of any class of which the voting powers, designations, preferences and relative, participating, optional or other rights, if any, or the qualifications, limitations or restrictions thereof, if any, shall not have been set forth in the certificate of incorporation or in any amendment thereto but shall be provided for in a resolution or resolutions adopted by the board of directors pursuant to authority expressly vested in it by the provisions of the certificate of incorporation or any amendment thereto, a certificate setting forth a copy of such resolution or resolutions and the number of shares of stock of such class or series shall be executed, acknowledged, filed, recorded, and shall become effective, in accordance with § 103 of this title.

**1352**

*v. Olson*, Del.Ch., C.A. No. 5798, Brown, V.C. (March 8, 1979).

Appellants' sham contention fails in both regards. As to the Rights, they can and will be exercised upon the happening of a triggering mechanism, as we have observed during the current struggle of Sir James Goldsmith to take control of Crown Zellerbach. *See* Wall Street Journal, July 26, 1985, at 3, 12. As to the preferred shares, we agree with the Court of Chancery that they are distinguishable from sham securities invalidated in *Telvest, supra*. The Household preferred, issuable upon the happening of a triggering event, have superior dividend and liquidation rights.

Third, appellants contend that § 157 authorizes the issuance of Rights "entitling holders thereof to purchase from the corporation any shares of *its* capital stock of any class ..." (emphasis added). Therefore, their contention continues, the plain language of the statute does not authorize Household to issue rights to purchase another's capital stock upon a merger or consolidation.

Household contends, *inter alia*, that the Rights Plan is analogous to "anti-destruction" or "anti-dilution" provisions which are customary features of a wide variety of corporate securities. While appellants seem to concede that "anti-destruction" provisions are valid under Delaware corporate law, they seek to distinguish the Rights Plan as not being incidental, as are most "anti-destruction" provisions, to a corporation's statutory power to finance itself. We find no merit to such a distinction. We have already rejected appellants' similar contention that § 157 could only be used for financing purposes. We also reject that distinction here.

"Anti-destruction" clauses generally ensure holders of certain securities of the protection of their right of conversion in the event of a merger by giving them the right to convert their securities into whatever securities are to replace the stock of their company. *See Broad v. Rockwell International Corp.*, 5th Cir., 642 F.2d 929, 946, *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981); *Wood v. Coastal States Gas Corp.*, Del.Supr., 401 A.2d 932, 937–39 (1979); *B.S.F. Co. v. Philadelphia National Bank*, Del.Supr., 204 A.2d 746, 750–51 (1964). The fact that the rights here have as their purpose the prevention of coercive two-tier tender offers does not invalidate them.

Fourth, appellants contend that Household's reliance upon § 157 is contradictory to 8 *Del.C.* § 203.[9] Section 203 is a "notice" statute which generally requires that

**9.** 8 *Del.C.* § 203 provides in relevant part:

(a) No offeror shall make a tender offer unless:

(1) Not less than 20 nor more than 60 days before the date the tender offer is to be made, the offeror shall deliver personally or by registered or certified mail to the corporation whose equity securities are to be subject to the tender offer, at its registered office in this State or at its principal place of business, a written statement of the offeror's intention to make the tender offer....

(2) The tender offer shall remain open for a period of at least 20 days after it is first made to the holders of the equity securities, during which period any stockholder may withdraw any of the equity securities tendered to the offeror, and any revised or amended tender offer which changes the amount or type of consideration offered or the number of equity securities for which the offer is made shall remain open at least 10 days following the amendment; and

(3) The offeror and any associate of the offeror will not purchase or pay for any tendered equity security for a period of at least 20 days after the tender offer is first made to the holders of the equity securities, and no such purchase or payment shall be made within 10 days after an amended or revised tender offer if the amendment or revision changes the amount or type of consideration offered or the number of equity securities for which the offer is made. If during the period the tender offer must remain open pursuant to this section, a greater number of equity securities is tendered than the offeror is bound or willing to purchase, the equity securities shall be purchased pro rata, as nearly as may be, according to the number of shares

timely notice be given to a target of an offeror's intention to make a tender offer. Appellants contend that the lack of stronger regulation by the State indicates a legislative intent to reject anything which would impose an impediment to the tender offer process. Such a contention is a *non sequitur.* The desire to have little state regulation of tender offers cannot be said to also indicate a desire to also have little private regulation. Furthermore, as we explain *infra,* we do not view the Rights Plan as much of an impediment on the tender offer process.

Fifth, appellants contend that if § 157 authorizes the Rights Plan it would be unconstitutional pursuant to the Commerce Clause and Supremacy Clause of the United States Constitution. Household counters that appellants have failed to properly raise the issues in the Court of Chancery and are, therefore, precluded from raising them. Moreover, Household counters that appellants' contentions are without merit since the conduct complained of here is private conduct of corporate directors and not state regulation.

■ It is commonly known that issues not properly raised in the trial court will not be considered in the first instance by this Court. Supreme Court Rule 8. We cannot conclude here that appellants have failed to adequately raise their constitutional issues in the Court of Chancery. Appellants raised the Commerce Clause and Supremacy Clause contentions in their "pretrial memo of points and authorities" and in their opening argument at trial. The

fact that they did not again raise the issues in their post-trial briefing will not preclude them from raising the issues before this Court.

■ Appellants contend that § 157 authorization for the Rights Plan violates the Commerce Clause and is void under the Supremacy Clause, since it is an obstacle to the accomplishment of the policies underlying the Williams Act. Appellants put heavy emphasis upon the case of *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), in which the United States Supreme Court held that the Illinois Business Takeover Act was unconstitutional, in that it unduly burdened interstate commerce in violation of the Commerce Clause.[10] We do not read the analysis in *Edgar* as applicable to the actions of private parties. The fact that directors of a corporation act pursuant to a state statute provides an insufficient nexus to the state for there to be state action which may violate the Commerce Clause or Supremacy Clause. *See Data Probe Acquisition Corp. v. Datatab, Inc.,* 2d Cir., 722 F.2d 1, 5 (1983).

Having concluded that sufficient authority for the Rights Plan exists in 8 *Del.C.* § 157, we note the inherent powers of the Board conferred by 8 *Del.C.* § 141(a),[11] concerning the management of the corporation's "business and *affairs*" (emphasis added), also provides the Board additional authority upon which to enact the Rights Plan. *Unocal,* 493 A.2d at 953.

### B.

■ Appellants contend that the Board is unauthorized to usurp stockholders'

---

tendered during such period by each equity security holder.

**10.** Justice White, joined by Chief Justice Burger and Justice Blackman also concluded that the Illinois Business Takeover Act was pre-empted by the Williams Act. *Edgar,* 457 U.S. at 630, 102 S.Ct. at 2634.

**11.** 8 *Del.C.* § 141(a) provides:
(a) The business and affairs of every corporation organized under this chapter shall be

managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation. If any such provision is made in the certificate of incorporation, the powers and duties conferred or imposed upon the board of directors by this chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation.

rights to receive tender offers by changing Household's fundamental structure. We conclude that the Rights Plan does not prevent stockholders from receiving tender offers, and that the change of Household's structure was less than that which results from the implementation of other defensive mechanisms upheld by various courts.

Appellants' contention that stockholders will lose their right to receive and accept tender offers seems to be premised upon an understanding of the Rights Plan which is illustrated by the SEC *amicus* brief which states: "The Chancery Court's decision seriously understates the impact of this plan. In fact, as we discuss below, the Rights Plan will deter not only two-tier offers, but virtually all hostile tender offers."

The fallacy of that contention is apparent when we look at the recent takeover of Crown Zellerbach, which has a similar Rights Plan, by Sir James Goldsmith. Wall Street Journal, July 26, 1985, at 3, 12. The evidence at trial also evidenced many methods around the Plan ranging from tendering with a condition that the Board redeem the Rights, tendering with a high minimum condition of shares and Rights, tendering and soliciting consents to remove the Board and redeem the Rights, to acquiring 50% of the shares and causing Household to self-tender for the Rights. One could also form a group of up to 19.9% and solicit proxies for consents to remove the Board and redeem the Rights. These are but a few of the methods by which Household can still be acquired by a hostile tender offer.

■ In addition, the Rights Plan is not absolute. When the Household Board of Directors is faced with a tender offer and a request to redeem the Rights, they will not be able to arbitrarily reject the offer. They will be held to the same fiduciary standards any other board of directors would be held to in deciding to adopt a defensive mechanism, the same standard as

they were held to in originally approving the Rights Plan. *See Unocol*, 493 A.2d at 954–55, 958.

In addition, appellants contend that the deterence of tender offers will be accomplished by what they label "a fundamental transfer of power from the stockholders to the directors." They contend that this transfer of power, in itself, is unauthorized.

The Rights Plan will result in no more of a structural change than any other defensive mechanism adopted by a board of directors. The Rights Plan does not destroy the assets of the corporation. The implementation of the Plan neither results in any outflow of money from the corporation nor impairs its financial flexibility. It does not dilute earnings per share and does not have any adverse tax consequences for the corporation or its stockholders. The Plan has not adversely affected the market price of Household's stock.

Comparing the Rights Plan with other defensive mechanisms, it does less harm to the value structure of the corporation than do the other mechanisms. Other mechanisms result in increased debt of the corporation. *See Whittaker Corp. v. Edgar, supra* (sale of "prize asset"), *Cheff v. Mathes, supra*, (paying greenmail to eliminate a threat), *Unocal Corp. v. Mesa Petroleum Co., supra*, (discriminatory self-tender).

There is little change in the governance structure as a result of the adoption of the Rights Plan. The Board does not now have unfettered discretion in refusing to redeem the Rights. The Board has no more discretion in refusing to redeem the Rights than it does in enacting any defensive mechanism.

The contention that the Rights Plan alters the structure more than do other defensive mechanisms because it is so effective as to make the corporation completely safe from hostile tender offers is likewise without merit. As explained above, there

are numerous methods to successfully launch a hostile tender offer.

### C.

Appellants' third contention is that the Board was unauthorized to fundamentally restrict stockholders' rights to conduct a proxy contest. Appellants contend that the "20% trigger" effectively prevents any stockholder from first acquiring 20% or more shares before conducting a proxy contest and further, it prevents stockholders from banding together into a group to solicit proxies if, collectively, they own 20% or more of the stock.[12] In addition, at trial, appellants contended that read literally, the Rights Agreement triggers the Rights upon the mere acquisition of the right to vote 20% or more of the shares through a proxy solicitation, and thereby precludes any proxy contest from being waged.[13]

■ Appellants seem to have conceded this last contention in light of Household's response that the receipt of a proxy does not make the recipient the "beneficial owner" of the shares involved which would trigger the Rights. In essence, the Rights Agreement provides that the Rights are triggered when someone becomes the "beneficial owner" of 20% or more of Household stock. Although a literal reading of the Rights Agreement definition of "beneficial owner" would seem to include those shares which one has the right to vote, it has long been recognized that the relationship between grantor and recipient of a proxy is one of agency, and the agency is revocable by the grantor at any time. Henn, *Corporations* § 196, at 518. Therefore, the holder of a proxy is not the "beneficial owner" of the stock. As a result, the mere acquisition of the right to vote 20% of the shares does not trigger the Rights.

The issue, then, is whether the restriction upon individuals or groups from first acquiring 20% of shares before waging a proxy contest fundamentally restricts stockholders' right to conduct a proxy contest. Regarding this issue the Court of Chancery found:

> Thus, while the Rights Plan does deter the formation of proxy efforts of a certain magnitude, it does not limit the voting power of individual shares. On the evidence presented it is highly conjectural to assume that a particular effort to assert shareholder views in the election of directors or revisions of corporate policy will be frustrated by the proxy feature of the Plan. Household's witnesses, Troubh and Higgins described recent corporate takeover battles in which insurgents holding less than 10% stock ownership were able to secure corporate control through a proxy contest or the threat of one.

*Moran,* 490 A.2d at 1080.

We conclude that there was sufficient evidence at trial to support the Vice-Chancellor's finding that the effect upon proxy contests will be minimal. Evidence at trial established that many proxy contests are won with an insurgent ownership of less than 20%, and that very large holdings are no guarantee of success. There was also testimony that the key variable in proxy contest success is the merit of an insurgent's issues, not the size of his holdings.

### IV

Having concluded that the adoption of the Rights Plan was within the authority of the Directors, we now look to whether the Directors have met their burden under the business judgment rule.

---

**12.** Appellants explain that the acquisition of 20% of the shares trigger the Rights, making them non-redeemable, and thereby would prevent even a future friendly offer for the ten-year life of the Rights.

**13.** The SEC still contends that the mere acquisition of the right to vote 20% of the shares through a proxy solicitation triggers the rights. We do not interpret the Rights Agreement in that manner.

 The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984) (citations omitted). Notwithstanding, in *Unocal* we held that when the business judgment rule applies to adoption of a defensive mechanism, the initial burden will lie with the directors. The "directors must show that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed.... [T]hey satisfy that burden 'by showing good faith and reasonable investigation....'" *Unocal,* 493 A.2d at 955 (citing *Cheff v. Mathes,* 199 A.2d at 554–55). In addition, the directors must show that the defensive mechanism was "reasonable in relation to the threat posed." *Unocal,* 493 A.2d at 955. Moreover, that proof is materially enhanced, as we noted in *Unocal,* where, as here, a majority of the board favoring the proposal consisted of outside independent directors who have acted in accordance with the foregoing standards. *Unocal,* 493 A.2d at 955; *Aronson,* 473 A.2d at 815. Then, the burden shifts back to the plaintiffs who have the ultimate burden of persuasion to show a breach of the directors' fiduciary duties. *Unocal,* 493 A.2d at 958.

There are no allegations here of any bad faith on the part of the Directors' action in the adoption of the Rights Plan. There is no allegation that the Directors' action was taken for entrenchment purposes. Household has adequately demonstrated, as explained above, that the adoption of the Rights Plan was in reaction to what it perceived to be the threat in the market place of coercive two-tier tender offers. Appellants do contend, however, that the Board did not exercise informed business judgment in its adoption of the Plan.

Appellants contend that the Household Board was uninformed since they were,

*inter alia,* told the Plan would not inhibit a proxy contest, were not told the plan would preclude all hostile acquisitions of Household, and were told that Delaware counsel opined that the plan was within the business judgment of the Board.

As to the first two contentions, as we explained above, the Rights Plan will not have a severe impact upon proxy contests and it will not preclude all hostile acquisitions of Household. Therefore, the Directors were not misinformed or uninformed on these facts.

Appellants contend the Delaware counsel did not express an opinion on the flip-over provision of the Rights, rather only that the Rights would constitute validly issued and outstanding rights to subscribe to the preferred stock of the company.

 To determine whether a business judgment reached by a board of directors was an informed one, we determine whether the directors were grossly negligent. *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 873 (1985). Upon a review of this record, we conclude the Directors were not grossly negligent. The information supplied to the Board on August 14 provided the essentials of the Plan. The Directors were given beforehand a notebook which included a three-page summary of the Plan along with articles on the current takeover environment. The extended discussion between the Board and representatives of Wachtell, Lipton and Goldman, Sachs before approval of the Plan reflected a full and candid evaluation of the Plan. Moran's expression of his views at the meeting served to place before the Board a knowledgeable critique of the Plan. The factual happenings here are clearly distinguishable from the actions of the directors of Trans Union Corporation who displayed gross negligence in approving a cash-out merger. *Id.*

In addition, to meet their burden, the Directors must show that the defensive

mechanism was "reasonable in relation to the threat posed". The record reflects a concern on the part of the Directors over the increasing frequency in the financial services industry of "boot-strap" and "bust-up" takeovers. The Directors were also concerned that such takeovers may take the form of two-tier offers.[14] In addition, on August 14, the Household Board was aware of Moran's overture on behalf of D-K-M. In sum, the Directors reasonably believed Household was vulnerable to coercive acquisition techniques and adopted a reasonable defensive mechanism to protect itself.

### V

In conclusion, the Household Directors receive the benefit of the business judgment rule in their adoption of the Rights Plan.

The Directors adopted the Plan pursuant to statutory authority in 8 *Del.C.* §§ 141, 151, 157. We reject appellants' contentions that the Rights Plan strips stockholders of their rights to receive tender offers, and that the Rights Plan fundamentally restricts proxy contests.

The Directors adopted the Plan in the good faith belief that it was necessary to protect Household from coercive acquisition techniques. The Board was informed as to the details of the Plan. In addition, Household has demonstrated that the Plan is reasonable in relation to the threat posed. Appellants, on the other hand, have failed to convince us that the Directors breached any fiduciary duty in their adoption of the Rights Plan.

While we conclude for present purposes that the Household Directors are protected by the business judgment rule, that does not end the matter. The ultimate response to an actual takeover bid must be judged by the Directors' actions at that time, and nothing we say here relieves them of their basic fundamental duties to the corporation and its stockholders. *Unocal*, 493 A.2d at 954–55, 958; *Smith v. Van Gorkom*, 488 A.2d at 872–73; *Aronson*, 473 A.2d at 812–13; *Pogostin v. Rice*, Del.Supr., 480 A.2d 619, 627 (1984). Their use of the Plan will be evaluated when and if the issue arises.

\* \* \*

AFFIRMED.

---

**14.** We have discussed the coercive nature of two-tier tender offers in *Unocal*, 493 A.2d at 956, n. 12. We explained in *Unocal* that a discriminatory self-tender was reasonably related to the threat of two-tier tender offers and possible greenmail.