**DYNAMICS CORPORATION OF AMERICA, Plaintiff,**

v.

**CTS CORPORATION, Robert D. Hostetler, Gary B. Erekson, Joseph DiGirolamo, George F. Sommer, Gerald H. Frieling, Jr., Don J. Kacek, Ted Ross, and Richard M. Ringoen, Defendants.**

No. 86 C 1624.

United States District Court,
N.D. Illinois, E.D.

June 20, 1986.

Lowell E. Sachnoff, William N. Weaver, Jr., Dean A. Dickie, Sarah R. Wolff, Thomas J. Bamonte, Sachnoff, Weaver & Rubenstein, Ltd., Chicago, Ill., for plaintiff Dynamics Corp.

Timothy A. Nelsen, Mark T. Carberry, Christina M. Tchen, Skadden, Arps, Slate, Meagher & Flom, Chicago, Ill., for Outside Director defendants Sommer, Frieling, Kacek, Ross & Ringoen.

Stephen Sandels, Gary Prior, McDermott, Will & Emery, Chicago, Ill., for CTS Corp., Hostetler, DiGirolamo & Erekson.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This action under the Securities Exchange Act and pendent state-law counts is before the court pursuant to a directive from the Seventh Circuit for a supplemental opinion. The procedural background of this request is as follows. On April 17, 1986, 637 F.Supp. 406, this court preliminarily enjoined defendant CTS Corporation from enforcing an acquisition triggered "flip-in" shareholder rights plan to prevent a partial tender offer and proxy fight by plaintiff Dynamics Corporation of America ("DCA"). The injunction was appealed on an emergency basis, and was affirmed on April 23, 1986, with a notation that an opinion explaining the grounds of decision would follow.

Contemporaneously with pursuing the appeal, defendant directors of CTS began a series of meetings to discuss the ramifications of this court's opinion and the alternative steps they could legally take to protect CTS shareholders from what they perceived to be the threat involved in DCA's using its substantial minority position to dominate CTS affairs. Shortly after the appellate decision was announced, a special committee of CTS outside directors announced that CTS was up for sale to the highest bidder and adopted a "back-end" shareholder rights plan to implement an orderly sale. On May 3, 1986, following expedited discovery and briefing, I denied DCA's motion to enjoin the second rights plan but ordered certain corrective disclosures to be sent to shareholders regarding the probability of a near term sale at the plan's exercise price, 635 F.Supp. 1174.

Since the date of that opinion, several material developments have occurred which are not part of the record on appeal. DCA did not appeal the denial of the injunction, but continued to wage its proxy fight. After noting positive market reaction to CTS's decision to sell the company, DCA announced to shareholders that it too was committed to sell the company as soon as practicable and campaigned on the theory

that it could do a better job of selling CTS than could the incumbent board of directors. DCA has stated that $46 per share would be a break-even price for DCA, and this suggests that DCA believes it could sell CTS for more than $46 per share.

The election was held on May 16, 1986. On May 28, 1986, the Court of Appeals issued in typescript its written opinion affirming the injunction of the first rights plan. On May 30, 1986, the election results were certified, and the CTS slate of nominees to the board of directors was seated. That same day, DCA filed a notice of appeal and a request for expedited appeal.

On Friday, June 7, 1986, the Court of Appeals granted the request for acceleration, but asked this court first to issue a supplementary opinion within two weeks to address what bearing, if any, the May 28 written opinion had on my May 3, 1986 decision. During a telephone conference call held that afternoon, DCA requested an opportunity to file briefs outlining its views on the question, and a briefing schedule was set. I asked the parties at that time to file a stipulation of supplemental facts regarding the election results, since I considered these supplemental developments to be of potential significance to myself and to the Court of Appeals notwithstanding the fact that they could not have been known to me at the time of my May 3, 1986 decision. The parties did so, and DCA also (without leave of court) filed affidavits as evidence that it would have bought more CTS shares as the election neared had the rights plan not been in effect. As of June 11, 1986, CTS has not been sold, nor has anyone (including DCA) offered to purchase CTS.

### Legal Discussion

The injunction was denied on May 3, 1986, and jurisdiction over that decision is presently vested in the Court of Appeals. The Seventh Circuit did not remand the case to this court for reconsideration or factual findings based on the new developments in this case, but simply requested a supplementary opinion as to whether I would have reached a different result on May 3 had the Court of Appeals' written opinion been then available. I believe I am precluded from writing a new opinion deciding the motion for preliminary injunction based on the new developments in this case. However, these new facts will be mentioned because they have been referred to by the parties and relate to the issue of relief on appeal.

■ The standards applied in my decision not to enjoin the second rights plan were identical to those which I applied when enjoining the earlier plan: namely, that a board of directors responding to a takeover threat must (1) show good faith and reasonable investigation, and (2) establish that any defense mechanism is reasonable in relation to the threat posed. The difference in outcome of the two opinions stemmed entirely from a difference in the underlying facts, and not a change in the legal standard. Despite some harsh economic criticism of poison pill plans generally, nothing in the Seventh Circuit opinion imposes a different judicial inquiry than that previously employed by this court. Consistent with our constitutional obligations under *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the Seventh Circuit recognized that the question at issue was one "committed to the authority of the states" and that its task was "only to predict how the Indiana courts would evaluate CTS's poison pill maneuver." *Dynamics Corp. of America v. CTS Corp.,* 794 F.2d 250, 255, 253 (7th Cir.1986). (hereafter "Op.") This task was the same I set for myself on May 3.

The Seventh Circuit further recognized that the relevant state authority has been clearly set forth in the Delaware Supreme Court decisions relied on by this court: *Revlon, Inc. v. MacAnderews & Forbes Holdings, Inc.,* 506 A.2d 173, 180 (Del. 1986); *Moran v. Household International Inc.,* 500 A.2d 1346, 1356 (Del.1985); and *Unocal v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del.1985). In reliance on these decisions this court expressly analyzed on May 3 whether the board had sufficient

evidence to "conclude that a present sale of the company as a whole would maximize shareholder welfare." (May 3 Mem. Op. at p. 1179). The Seventh Circuit's distillation of Delaware law is the same: "defensive measures in general and poison pills in particular are within the power of the board of directors of a target corporation" but will only be upheld if "plausibly related to the goal of stockholder wealth maximization." (Op. at p. 256).

■ This court expressly found on May 3 that the decision to sell the company, and the adoption of the second pill plan as a protective device to assure an orderly sale process, were not based on the goal of defeating DCA at all costs but were based on two concerns: (1) that DCA might later decide to engage in a second-step merger and (2) that DCA's large position would deter other potential bidders for the company. The CTS board had been advised that a sizeable minority shareholder may inhibit the sale of a public company to the detriment of the stock price, and the court found this premise "a rational assumption from which the Board [could] conclude that many CTS shareholders would be better off with a present sale rather than with DCA exercising managerial control through a sizeable minority position." (May 3 Mem. Op. at p. 1179). The second rights plan, having been adopted as an adjunct to the sale and a means for insuring an orderly auction of the company, was therefore upheld as reasonable in relation to the concern articulated by the CTS board.

This court did express certain doubts that the above premise was dangerously convenient to a board of directors faced with a takeover challenge. The court had no evidence before it that the premise was invoked in bad faith, however, and was presented with affidavits from several independent investment bankers supporting the reasonableness of the premise. DCA offered no conflicting affidavits, and the premise seemed more reasonable than others indulged in by the Delaware Supreme Court. *See, e.g., Household,* 500 A.2d at 1355 (finding that limiting hostile acquisi-tions to 20% would not affect proxy contests). I considered the earlier evidence of entrenchment motive but found it of minor relevance due to the decision to sell CTS and the shift in procedures on the part of the board, particularly the shift in the principal decision-makers from inside to outside directors. *See Household,* 500 A.2d at 1356. Therefore, I declined to second-guess the board's judgment in this regard.

Interestingly enough, the Delaware Chancery Court has since noted in a takeover case that an acquiror's 35% position acted to deter potential acquirors of a company up for sale. *Hecco Ventures v. Sea-Land Corporation,* Civ. Action No. 8486 (Del.Ch. May 19, 1986), Slip Op. at 3 n. 1. [Available on WESTLAW, DE–CS database.] While subsequent events in the *Sea-Land* case call the premise into some question, this court's task is not to choose sides once a corporate board meets its initial burden under *Household* and *Unocal:* only reasonableness of inquiry and response is required. The court therefore concludes that the second CTS rights plan is "plausibly related to the goal of shareholder wealth maximization" as required by Delaware law.

DCA repeatedly suggests that, under the Seventh Circuit opinion, this court must analyze whether the rights plan *actually* promotes shareholder wealth, not merely whether it bears a plausible relation to that goal, and argues that the second rights plan did not meet this criterion. The court seriously doubts that the Seventh Circuit intended such a test, since it hinges the legality of directors' judgments in every case on post-facto developments. Even utilizing this standard, however, the second plan did not adversely affect the stock price at the time of issuance; the opposite occurred, and there is no evidence that the drop in price since May 3 reflects a lower price than CTS stock would command with DCA at the helm.

Secondly, the hindsight developments created by DCA suggest that the second rights plan does maximize shareholder welfare. DCA's announcement in the second

week of May of its own decision to sell CTS reflected not only positive market response to CTS's decision to sell, but also, as earlier noted, DCA's probable belief that it could sell the company at a stock price of at least $46 per share. Moreover, DCA's campaign announcement that it could obtain a better price reflects in part the same factor which concerned the CTS board in adopting the new plan: namely, that the threat of its noncooperation in an auction of the company might inhibit bidders. As noted earlier, these matters are outside the scope of my assigned task, and presumably would be outside the record currently before the Court of Appeals. However, these facts are obviously relevant to the current situation. DCA is now trying to have the second poison pill plan invalidated, not in connection with the shareholders' meeting which is long past, but in connection with its present corporate options and its present inability to acquire more shares. DCA is not foreclosed under the second rights plan from acquiring CTS, but apparently is not interested in acquiring the entire company.

DCA also argues that the Seventh Circuit outlined a three-step approach to determine if rights plans are consistent with the goal of shareholder wealth maximization under Delaware law—first, by looking to the impact of the plan on a would-be acquiror; second, by assessing the financial burden the plan would impose on the target; and third, by considering the claimed benefits of the plan. These factors are the same ones this court looked to in determining whether both the first and second rights plans were "reasonable in relation to the threat posed" and do not to this court's mind presage a new test for the legality of such plans. The court concedes that these factors were not addressed at quite the same length in my May 3 opinion as in the earlier opinion; this relative lack of detail, however, was predicated on the strong signs from *Revlon* that the Delaware courts would find the second plan to be a proper exercise of business judgment.

DCA finally emphasizes the following passage of the Seventh Circuit opinion:

If the rationale is to protect minority shareholders, it should be triggered by a transaction that creates a majority shareholder or that attempts to squeeze out the minority shareholders, and it should give the minority the same price per share as the majority—not a higher price, calculated to kill off the tender; to kill off, indeed, any tender.

(Op. at p. 259). These criteria are a sensible articulation of why the first plan was so extreme in relationship to the alleged threat at that time. The second rights plan, however, was adopted upon a different set of concerns: the rationale was not solely to protect minority shareholders from a second-step transaction, but also to protect them from a loss of control premium which could result from DCA dominating CTS through a large minority position even should no second-step transaction occur.

Moreover, the plan was not designed to "thwart the operation of the market in corporate control" (Op. at p. 256), or "calculated to kill off ... any tender" (Op. at p. 260). Indeed, the plan does not preclude a takeover, but is designed to foster a takeover at a negotiated price in the best interests of all of the shareholders of CTS. Hostile takeovers at a price in excess of $50 a share are not precluded. These features render the second plan sharply distinguishable from the first rights plan, whose economic features were designed solely with the aim and effect of stopping any acquisition.

To read the quoted passage as an inflexible rule for all rights plans would be inconsistent with Delaware law. A holding that *any* rights plan should be triggered only by a coercive or 51% acquisition would conflict with *Revlon*, 506 A.2d at 177, and *Household*, 500 A.2d at 1348, in both of which the Delaware Supreme Court approved plans which triggered the rights upon a 20% acquisition. In *Household*, of course, the triggering of the rights had no immediate negative consequences; in *Revlon*, however, massive debt was triggered

immediately upon the hostile acquisition. Although the *Revlon* passage is technically dicta, it is phrased in terms of a holding and therefore operates as a strong indication of how the Delaware courts would resolve the issue. The Seventh Circuit passage, in contrast, appears to be illustrative rather than binding.

■ To invalidate rights plans for setting an exercise price higher than the price per share offered to the majority similarly would be precluded by Delaware law. In *Revlon,* the exercise price was calibrated above the price per share offered to other shareholders. In *Household,* the rights allowed each holder upon a second step transaction to pay $100 for $200 worth of the acquiror's stock. DCA properly points out that *Revlon* is distinguishable in that the $65 exercise price in that case was linked to the value the acquiror would realize upon breaking up the company. The $50 price in this case was not so closely calibrated, but was chosen to reflect the high end of realizable value over the one-year life of the plan. This court expressly stated, in open court prior to ruling, that an artificially high price would be evidence of entrenchment notwithstanding the decision to sell. The evidence showed, however, that investment advisors typically consider the high end of realizable value to be the appropriate measure for back-end plans, and the reasonableness of the $50 price value was confirmed by other analysts. Again, DCA put in no contrary evidence. Moreover, the CTS plan was less pernicious than the *Revlon* plan by having five-day "windows" for redemption and a shorter life span. The court therefore finds that DCA's probability of success has not materially changed as a result of the Seventh Circuit's opinion.

■ *Revlon* is also distinguishable in that the rights plan in that case instigated a bidding war and caused the unfriendly bidder to raise its price; CTS is still without a buyer. In this case, however, there was no active bid to acquire 100% of the company at the time the plan was adopted, and the comparison is therefore somewhat tenuous. Moreover, the court did not have this information before it on May 3 when it refused to enjoin the plan. If DCA wishes to rely on subsequent market effects as evidence that the balance of harms has tipped in its favor, it must then seek a new injunction based on all the changed circumstances, including the market reaction to the plan to sell, DCA's decision in the face of that reaction to announce that it too would seek to sell the company, the election results, and DCA's present challenge to the election results. The latter, if successful, would significantly change the balance of hardships.

One discernible area in which the Seventh Circuit's interpretation of Delaware law potentially differs from mine concerns the degree of inquiry a court should entertain before determining that a board of directors has met its burden under *Household.* As I noted on May 3, DCA raised some colorable arguments on the reasonableness of the directors' decision to sell by reference to less restrictive alternatives available for protecting CTS minority shareholders. (May 3 Mem. Op. at p. 1180). The sale plan, however, presented certain benefits for shareholders which the board had reason to conclude would be foreclosed under these "lesser" alternatives. *Id.* Mindful that the Delaware Supreme Court's cases have in spirit been highly protective of defensive measures, this court concluded that the directors need only show that their decision was reasonable. To engraft a "less restrictive alternative" approach from constitutional law onto matters of corporate governance seemed to this court inappropriate and inconsistent with Delaware law because it would encourage too much judicial second-guessing of business decisions. The Seventh Circuit has not yet addressed this issue. While I see no indication in their opinion that they might disagree with me, and doubt that a more "searching" inquiry would have changed my result, the issue is at least an open one.

For these reasons, the court concludes that the Seventh Circuit did not purport to

change the legal standards which I adopted in my April 17 and May 3 decisions, and finds that to the extent it emphasized certain of those standards, my May 3 decision remains correct as a matter of law. Obviously, the Seventh Circuit's opinion does not change my earlier conclusions about the balance of hardships involved in enjoining the second rights plan. In particular, I found that one effect of enjoining the plan would be to block CTS shareholders other than DCA from having a voice in determining whether or not to sell the company. Therefore, the equities were not as equal as they had been on the earlier decision.

Finally, this court believes that the second rights plan should not be enjoined at this juncture without analysis of the changed factual circumstances. These changed circumstances are outside the scope of the record, and can only be examined fully if the appeal is remanded for new proceedings.