Leonard Loventhal ACCOUNT,
Plaintiff Below,
Appellant,

v.

HILTON HOTELS CORPORATION, a
Delaware Corporation, Defendant
Below, Appellee.

Nos. 584, 2000.

Supreme Court of Delaware.

Submitted: June 20, 2001.
Decided: Sept. 6, 2001.

Michael Hanrahan, (argued), Gary F. Traynor, Paul A. Fioravanti, Jr., Prickett, Jones & Elliott, Wilmington, Delaware, for appellant.

Jesse A. Finkelstein, (argued), J. Travis Laster, Richards, Layton & Finger, Wilmington, Delaware for appellee.

Before WALSH, HOLLAND, and BERGER, Justices.

WALSH, Justice.

In this appeal from the Court of Chancery, we revisit the question of whether the board of directors of a Delaware corporation may unilaterally adopt a poison pill rights plan. The appellant challenged the authority of the defendant, Hilton Hotels Corporation ("Hilton"), to adopt such a plan and require its common shareholders' adherence to its terms. The plaintiff shareholders rejected participation in the plan and thereafter commenced an action in the Court of Chancery seeking to invalidate its issuance. The Court of Chancery rejected that effort, ruling that under the principle of *stare decisis,* Hilton's entitlement to implement the rights plan was not subject to challenge. We agree and affirm.

## I

Hilton is a Delaware corporation that owns, manages and franchises hotels worldwide. Appellant/plaintiff-below, Leonard Loventhal Account (the "Trust") claims to be, and is assumed to have been at all relevant times, a holder of Hilton common stock. In 1988, the Hilton Board adopted a rights plan and upon its expiration ten years later adopted a second rights plan (the "Rights Plan"). On November 29, 1999, in connection with a merger with Promos Hotel Corporation, Hilton adopted the plan now under attack. The plan was implemented through a written agreement (the "Rights Agreement") between Hilton and Chase Mellon Shareholder Services L.L.C., as the Rights Agent. The Agreement provides for one

right, in the form of a dividend of one preferred share purchase right, to be attached to each share of Hilton common stock. Each right entitles the holder to purchase for $80 one one-hundredth of a share of Series A Junior Participating Preferred Stock. Upon the occurrence of a triggering event, the rights entitle the holder to purchase two shares of Hilton common stock at half-price.

Hilton informed its shareholders of the new Rights Agreement by letter dated November 30, 1999, which also included a summary of the Rights Agreement. The letter stated that:

> [n]o action on your part is required at this time, and no money should be sent to Hilton. The rights will automatically attach to the shares of Common Stock you hold and will trade with them. There is no need to send in your certificates to have this reference added. You will be notified if the Rights are ever triggered and become exercisable.

The Trust responded by letter dated January 18, 2000, informing Hilton that the Trust refused to accept the rights Hilton was attempting to attach to the Trust's shares. The Trust further wrote that it did not agree "to being deemed or treated as an owner of rights and does not agree that the rights may be attached to or trade with the shares of Hilton common stock that the Trust owns." Nor did the Trust agree to have a legend evidencing the rights attached to its stock certificates. Finally, the Trust separately requested that 100 shares of Hilton common stock that it owned be registered of record in the name of the Trust.

On February 26, 2000, the Trust received a stock certificate with a legend incorporating the terms of the Rights Plan. The certificate also indicated that it evidenced rights that are attached to the shares of common stock. On February 20, 2000, the Trust filed an individual and class action suit challenging certain provisions of the Rights Agreement.

## II

In the Court of Chancery, the Trust advanced five Counts or claims challenging the Hilton Rights Plan. The first four Counts are directed to the basic, operative terms of the Rights Plan. In Count I, the Trust claims, in effect, that the Rights Plan is not a valid and enforceable agreement as to any shareholder who rejects its terms. Counts II, III, and IV are an attack on various implementing provisions of the Plan. In Count II, the Trust asserts that the issuance of legend-bearing restrictions violates Delaware law and Hilton's by-laws. In Count III, the Trust claims that requiring that the rights be traded in tandem with the underlying common stock violates § 202 of the Delaware General Corporation Law ("DGCL"). In Count IV, the Trust contends that the implementing provisions have altered Hilton's common stock contrary to its certificate of incorporation and provisions of the DGCL. Finally, in Count V, the Trust attacks a feature of the Rights Plan contained in section 31 that purports to relieve directors of "any liability" for implementing the Rights Plan. Hilton moved to dismiss the complaint for failure to state a claim upon which relief can be granted, arguing, in effect, that settled Delaware law rendered the Trust's claims unsupportable.

The Chancellor considered each of the claims advanced by the Trust and concluded that they were without merit and dismissible as a matter of law. *See Leonard Loventhal Account v. Hilton Hotels Corp.,* Del.Ch., No. 17803, 2000 WL 1528909, Chandler, C. (Oct. 10, 2000). The Chancellor ruled that the Trust's attack on the mechanism and format of the Rights Plan was foreclosed by a consistent body of law

beginning with the seminal decision in *Moran v. Household Int'l., Inc.*, Del.Ch., 490 A.2d 1059, *aff'd*, Del.Supr., 500 A.2d 1346 (1985), upholding so called "poison pill" defenses bottomed on rights plans. Under the doctrine of *stare decisis*, the Chancellor ruled that the Trust's challenges to the Hilton Rights Plan were barred. With respect to Count V, directed to section 31 of the Hilton Rights Plan, the Chancellor ruled that in view of Hilton's concession that the exculpatory provision was not intended to relieve the directors of their continuing fiduciary duties under the Rights Plan, the challenge to section 31 was moot.

On appeal, the Trust contends that the Court of Chancery erred in dismissing the complaint by misinterpreting the doctrine of *stare decisis* and employing an incorrect legal standard on a motion to dismiss. This Court reviews *de novo* a lower court's decision to grant a motion to dismiss. *See Malone v. Brincat*, Del. Supr., 722 A.2d 5, 9 (1998). Dismissal is appropriate under Court of Chancery Rule 12(b)(6) only where it appears "with a reasonable certainty that a plaintiff would not be entitled to the relief sought under any set of facts which could be proven to support the action." *Rabkin v. Philip A. Hunt Chem. Corp.*, Del.Supr., 498 A.2d 1099, 1104 (1985). In addition, whether claims are barred from consideration under the doctrine of *stare decisis* presents a question of law that is subject to *de novo* review. *See Fiduciary Trust Co. v. Fiduciary Trust Co.*, Del.Supr., 445 A.2d 927, 930 (1982).

The Chancellor concluded that *Moran* and its progeny created a series of precedents that could not be challenged in like litigation, *i.e.*, a shareholder could not seek to invalidate a rights plan adopted on the *Household* pattern. Although this Court has not had occasion in the recent past to elaborate on the doctrine of *stare decisis*, it is well established in Delaware jurisprudence. Once a point of law has been settled by decision of this Court, "it forms a precedent which is not afterwards to be departed from or lightly overruled or set aside ... and [it] should be followed except for urgent reasons and upon clear manifestation of error." *Oscar George, Inc. v. Potts*, Del.Supr., 115 A.2d 479, 481 (1955). The need for stability and continuity in the law and respect for court precedent are the principles upon which the doctrine of *stare decisis* is founded. *See Gannett Co., Inc. v. Kanaga*, Del.Supr., 750 A.2d 1174, 1181 (2000). In determining whether *stare decisis* applies, this Court should examine whether there is: "a judicial opinion by the [C]ourt, on a point of law, expressed in a final decision." *State v. Phillips*, Del.Ch., 400 A.2d 299, 308 (1979). The doctrine of *stare decisis* operates to fix a specific legal result to facts in a pending case based on a judicial precedent directed to identical or similar facts in a previous case in the same court or one higher in the judicial hierarchy. *See Allegheny Gen. Hosp. v. N.L.R.B.*, 3rd Cir., 608 F.2d 965, 969–70 (1979), *abrogated on other grounds by St. Margaret Mem'l Hosp. v. N.L.R.B.*, 3rd Cir., 991 F.2d 1146 (1993).

The doctrine of *stare decisis* finds ready application in Delaware corporate law. It is settled Delaware law that a corporation chartered under the laws of this State may adopt shareholder rights plans. *See Moran v. Household Int'l, Inc.*, Del.Supr., 500 A.2d 1346 (1985). In *Moran*, this Court determined that the adoption of a rights plan was a valid exercise of the board's authority.[1] Preliminarily, we

---

1. The plaintiff in *Moran* argued that the

DGCL did not authorize the issuance of a

concluded that 8 *Del.C.* §§ 157 and 141(a) provided the board sufficient authority upon which to enact the rights plan. *See Moran*, 500 A.2d at 1353. This Court also determined that the rights plan did not "usurp stockholders' rights to receive tender offers." *Id.* at 1354. Finally, we held that the rights plan would not have the unauthorized effect of restricting stockholders' rights to conduct a proxy contest. *See id.* at 1355–56.

■ In Count I of its complaint, the Trust seeks to invalidate the enforceability of the Rights Plan as to any shareholder who does not "accept" its terms. It posits its argument on section 16 of the Rights Plan which recites "AGREEMENT OF RIGHTS HOLDERS. Every holder of a Right by *accepting the same consents and agrees* with [Hilton] and the Rights Agent and with every holder of a Right that...." (emphasis supplied). In essence, the Trust argues that a rights plan agreement is a multi-party instrument requiring consent of all contracting parties, including affected shareholders, for its enforceability.

■ It is indisputable that *Moran* established a board's authority to adopt a rights plan. As the Chancellor pointed out below, "There is simply no legal requirement that the Hilton shareholder must be a party to the Rights Plan or formally vote to accept the Rights Plan to ensure that the Plan is enforceable." *Loventhal*, 2000 WL 1528909 at *5. While it is technically correct to argue that *Moran* did not explicitly pass upon the question of whether a rights plan required express consent of all parties affected by it, there is little doubt that *Moran*, *inter alia*, denied objecting shareholders the right to oppose implementation of a rights plan. *Moran*

addressed a fundamental question of corporate law in the context of takeovers: whether a board of directors had the power to adopt unilaterally a rights plan the effect of which was to interpose the board between the shareholders and the proponents of a tender offer. The power recognized in *Moran* would have been meaningless if the rights plan required shareholder approval. Indeed it is difficult to harmonize *Moran's* basic holding with a contention that questions a Board's prerogative to unilaterally establish a rights plan.

*Moran*, of course, did not address whether every provision that might be includable in a rights plan would be sustainable under all circumstances, although later decisions of the Court of Chancery and this Court did consider such permutations. *See, e.g., Quickturn Design Sys. v. Shapiro*, Del.Supr., 721 A.2d 1281 (1998); *Carmody v. Toll Bros., Inc.*, Del.Ch., 723 A.2d 1180 (1998). The Trust seeks to hold its shares free of the restrictions of the Rights Plan. If that claim is legally sustainable as to the Trust, it is equally available to every Hilton shareholder. Indeed, the Trust seeks class status to assert that argument broadly. To recognize viability of the contractual claim would emasculate the basic holding of *Moran*, both as to this case and *in futuro*, that directors of a Delaware corporation may adopt a rights plan unilaterally. The Chancellor determined that the doctrine of *stare decisis* precluded that result and we agree.

III

■ In Count II, the Trust contends that the Rights Agreement violates 6 *Del.C.* § 8–401 and 8 *Del.C.* § 158, and sections 24 and 25 of Hilton's by-laws, by

rights plan, the board impermissibly usurped the stockholders' rights to receive hostile tender offers through adoption of the rights plan,

and the board was unauthorized to restrict stockholders' rights to conduct a proxy contest. *See Moran*, 500 A.2d at 1351.

altering and legending the certificates for Hilton common stock and restricting the registration or transfer of Hilton common stock. The Trust argues that the Court of Chancery improperly invoked the doctrine of *stare decisis* because the Household rights plan did not contain a legending provision and the validity of the rights plan in *Moran* was not contested under 6 *Del.C.* § 8–401 and 8 *Del.C.* § 158.

The Chancellor, however, did not rely on *stare decisis* in dismissing this claim. He first determined that § 157 permitted the placing of the legend on the stock certificate and then concluded that the legend placed on the certificate "was validly approved by the Hilton Board in accordance with the Delaware Supreme Court's ruling in *Moran.*" *Loventhal,* 2000 WL 1528909 at *8. The Chancellor further noted that while § 158 gives shareholders the right to receive a certificate that does not contain inappropriate legends, the legend in this case is authorized by § 157 and therefore not inappropriate. *See id.* (citing *Bender v. Memory Metals, Inc.,* Del.Ch., 514 A.2d 1109 (1986)). *Moran's* approval of the substance of the legend as appropriate is a sufficient basis for rejecting this claim even if not precisely controlled by *stare decisis.*

### IV

◼ The Trust alleges in Count III that the adoption of the Rights Plan imposed an impermissible transfer restriction on the Hilton common stock it owns. It contends that the Court of Chancery erred in dismissing this claim on *stare decisis* grounds because the transfer, certificate and legending provisions on which the Trust's § 202 claim is based were not wholly present in Household's plan and there are important factual differences between the Household and Hilton plans. Specifically, the Trust points to sections

3.1, 3.2, and 3.3 of the Rights Agreement, which it contends were not contained in the Household rights plan and which mandate that the transfer of common stock include the transfer of rights. In addition, the Trust contends that the court erred because it is challenging Hilton's use of the rights, an issue *Moran* expressly left open.

The Chancellor determined that there were no significant operational differences between the relevant provisions of the Household rights plan and the Hilton Rights Plan, noting that "[t]he plaintiff in *Moran* directly challenged the Household rights plan as imposing an impermissible transfer restriction on Household common stock under § 202(b), just as this plaintiff attempts to do before this Court." *See id.* at *7. In *Moran,* the Court of Chancery, ruled that "the Rights Plan does not affect the trading of Household shares or the registration of shares once traded. The negotiability of shares is not conditioned and shares remain freely transferable as provided by § 159 of the DGCL." *Moran,* 490 A.2d at 1079. The Trust's restriction on transferability claim is clearly precluded on *stare decisis* grounds.

### V

◼ Count IV of the Trust's complaint alleges that the Rights Plan impermissibly altered Hilton's common stock in violation of §§ 151 and 242 of the DGCL and Hilton's certificate of incorporation. The Trust contends that this alteration was effected by the placement of a legend explicitly incorporating all the terms of the Rights Agreement on the certificates for common stock. The Court of Chancery held that this claim was directly raised and rejected by the trial court in *Moran* and concluded that, in *Moran,* no amendment was necessary and correspondingly no amendment to Hilton's certificate of incorporation was necessary here either. Al-

though the Trust contends that the present circumstances are distinguishable from *Moran* because Hilton has placed on its common stock certificates a legend that explicitly incorporates all the terms of the Rights Agreement as previously noted, the legend does little more than make explicit what the board has enacted substantively under the authority granted in *Moran.*

## VI

In Count V of the complaint, the Trust seeks declaratory relief to the effect that section 31 of the Rights Agreement violates 8 *Del.C.* § 102(b)(7) because it purports to relieve the Hilton directors from non-monetary liability for breaches of fiduciary duty. Although section 31 contains broad exculpatory language, Hilton conceded before the Chancellor that it was not intended to foreclose shareholder rights to assert fiduciary-based claims.[2] At argument in the Court of Chancery, counsel for Hilton stated that "[t]he provision only applies to the Company, the Rights Agent, 'the holders of the rights, as such' and other 'parties' to the agreement. Section 31 thus is not an attempt to limit liability to stockholders generally but rather only addresses claims brought under the [Rights Plan]." Hilton rejected that concession in argument before this Court. In light of this statement, the Chancellor held that Count V was rendered moot. The court did, however, require the order accompanying dismissal to include language stating that section 31 does not affect the rights of the shareholders with respect to the Hilton board nor the duties owed by the members of the board to the shareholders. The order, however, did not state this count was dismissed as moot.

The Trust contends that the effect of the Chancellor's ruling was not to render moot its attack on the power purportedly granted by section 31. Rather, the Trust argues that this was a decision in the Trust's favor and judgment should be so entered. Therefore, the claim is not moot and judgment should have been rendered for the plaintiff.

 The practical effect of Hilton's concession that section 31 is simply a "non-recourse" provision directed to claims by rights holders and is not intended to relieve the directors of their fiduciary duty of loyalty owed to Hilton shareholders is to justify the denial of relief under Count V. But the Chancellor did condition the dismissal of Count V on the insertion of language in the court's order of October 10, 2000 reflecting the limitation on the scope of section 31. Moreover, the Chancellor deferred consideration of plaintiff's entitlement to an award of counsel fees until disposition of this appeal. Thus, while we affirm the dismissal of Count V, we decline to characterize the effect of that dismissal on any further award of counsel fees.[3]

---

**2.** Section 31, after imparting broad authority to the directors to interpret and administer the Rights Agreement, provides that:

All such actions, calculations, interpretations and determinations (including for purposes of clause (y) below, all omissions with respect to the foregoing) that are done or made by the Board of directors of the Company in good faith shall (x) be final, conclusive and binding on the Company, the Rights Agent, the holders of the Rights, as such, and all other parties, and (y) not subject the Board of Directors to any liability to the holders of the Rights.

**3.** The Court of Chancery entered judgment in Hilton's favor pursuant to Court of Chancery Rule 54(b), permitting an appeal to this Court with respect to the matters adjudicated. That ruling did not conclude the litigation, however, since the Court specifically reserved jurisdiction presumably to consider an application for an award of counsel fees. *Lipson v. Lipson,* Del.Supr., —— A.2d ——, 2001 WL

That matter is not before us at this time and must await determination by the Chancellor.

The judgment of the Court of Chancery is affirmed.

710207, No. 108, 2001, Holland, J. (June 21, 2001).