# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MOELIS & COMPANY, | § | |
| | § | No. 340, 2024 |
| Defendant Below, | § | |
| Appellant, | § | |
| | § | |
| | § | Court Below: Court of Chancery |
| v. | § | of the State of Delaware |
| | § | |
| WEST PALM BEACH | § | C.A. No. 2023-0309 |
| FIREFIGHTERS' PENSION FUND, | § | |
| on behalf of itself and all other | § | |
| similarly-situated Class A | § | |
| stockholders of MOELIS & | § | |
| COMPANY, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: October 27, 2025
Decided: January 20, 2026

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW** and **GRIFFITHS**, Justices, constituting the Court *en banc*.

Upon appeal from the Court of Chancery. **REVERSED.**

John P. DiTomo, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; William Savitt, Esquire (*argued*), Anitha Reddy, Esquire, Won S. Shin, Esquire, Daniel B. Listwa, Esquire, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York, *for Defendant Below, Appellant Moelis & Company*.

Thomas Curry, Esquire (*argued*), SAXENA WHITE, P.A., Wilmington, Delaware, *for Plaintiff Below, Appellee West Palm Beach Firefighters' Pension Fund*.

Ned Weinberger, Esquire, Mark D. Richardson, Esquire, LABATON KELLER SUCHAROW LLP, Wilmington, Delaware; Lori Marks-Esterman, Esquire, Jacqueline Y. Ma, Esquire, OLSHAN FROME & WOLOSKY, New York, New York; Joel Fleming, Esquire, Amanda Crawford, Esquire, EQUITY LIGITATION

GROUP LLP, Boston, Massachusetts, *for Amici Curiae James An, Lucian A. Bebchuk, Anat Alon Beck, Ilya Beylin, Robert E. Bishop, Joan Heminway, Mark Lebovitch, Michael Klausner, Frank Partnoy, Brian JM Quinn, Usha R. Rodrigues, Robert B. Thompson, Anne Tucker, and Charles Whitehead.*

Raymond J. DiCamillo, Esquire, Robert B. Greco, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington Delaware, *for Amici Curiae Joseph A. Grundfest, Lawrence A. Hamermesh, Jonathan R. Macey, and Charles R.T. O'Kelley*.

**TRAYNOR**, Justice:

In the Court of Chancery, a stockholder sought a declaratory judgment that certain provisions of a stockholders agreement were facially invalid and unenforceable because the provisions interfere with the corporate board's management of the business and affairs of the corporation as required by 8 *Del. C.* § 141(a). In this opinion, we conclude that (i) to the extent that the challenged provisions are at odds with § 141(a), they are not void, but voidable, and (ii) the plaintiff's challenge is barred by laches.

In 2014, the corporation entered into the agreement with stockholders who are affiliated with its founder. The plaintiff filed its complaint in the Court of Chancery almost nine years later. The defendants countered that the agreement was facially valid but that, in any event, the plaintiff's challenge to the validity of the agreement was time-barred expressly by 10 *Del. C.* § 8106's three-year statute of limitations or by analogy under the doctrine of laches.

The Court of Chancery viewed the time-bar defense as an assertion of laches and rejected it on two grounds. First, the court accepted for the purpose of its timeliness analysis that the challenged provisions violated § 141(a). For the court, this meant that the provisions were void and, because equitable defenses such as laches cannot validate a void act, laches was not an available defense. Second, the Court held that, even if laches were an available defense, the plaintiff's delay was

3

excused because it alleged that the existence of the agreement was "an ongoing statutory violation." If that be the case, the court concluded, the existence of the agreement was a continuing wrong such that the court was not bound to follow the traditional rule governing limitations of actions—that is, that a cause of action accrues when the essential elements of a claim are in place such that a plaintiff can seek relief.

As we will explain later, we disagree with the Court of Chancery's conclusion that the challenged provisions are void—as opposed to voidable—because they were adopted in a manner that is at odds with § 141(a). The validity of voidable acts, of course, can be challenged, but such challenges are subject to equitable defenses, including laches.

In addition to that, we do not agree that, because the challenged provisions purportedly constitute an "ongoing statutory violation," the plaintiff was excused from challenging them in a timely manner. As we see it, the only wrongful conduct alleged in the complaint was the execution of the stockholders agreement in 2014. Despite the plaintiff's artful pleading, that is the gravamen of its complaint. To be sure, the plaintiff has alleged in general terms that the ongoing effects and implications of the stockholders agreement have harmed the corporation. But as we will develop more fully below, that does not mean that the plaintiff's cause of action grounded in the alleged facial invalidity of the agreement accrued as those effects

4

were felt and implications realized. To the contrary, all the elements of the plaintiff's claim were present and complete relief was available in 2014. The existence of the claim was not inherently unknowable then nor was there any impediment to bringing the claim in a timely manner. Hence, the plaintiff's claim accrued in 2014 and its challenge to the facial validity of the challenged provisions is time barred under the doctrine of laches. We therefore reverse the Court of Chancery's decision concluding otherwise.

## I

The relevant facts are undisputed. In 2007, Kenneth Moelis, a veteran investment banker, founded Moelis & Company, an independent investment bank. The company was immediately successful in securing and performing advisory work on high-profile M&A transactions. Before long, Moelis & Company had expanded globally. Kenneth Moelis has served as Moelis & Company's CEO and chaired its board of directors since its founding. The advisory business was initially held by Moelis & Company Holdings LP, a Delaware limited partnership.

## A

In 2014, Moelis & Company announced an initial public offering of its Class A common stock and changed its corporate structure in preparation for the IPO. The existing limited partnership transferred the company's advisory business to a new limited partnership, Moelis & Company Group LP ("Group LP"). An LLC was

formed to act as the general partner of Group LP, and the equity interest in that LLC was transferred to Moelis & Company ("Moelis"), a Delaware corporation formed to operate as a holding company. Moelis received partnership units representing a 27% economic interest in Group LP. Most of the remaining economic interest in Group LP was transferred to Moelis & Company Partner Holdings LP ("Partner Holdings"), an entity controlled by Kenneth Moelis.

Moelis, the publicly traded entity, has two authorized classes of common stock. Public stockholders hold Class A common stock that carries one vote per share. Class B common stock carries 10 votes per share so long as five conditions set forth in the Moelis charter are satisfied. The "Class B Condition" is satisfied if Kenneth Moelis (1) owns at least 4,458,445 shares of Class A stock; (2) owns at least 5% of the Class A stock; (3) has not been convicted of a felony in violation of securities laws or other crime of moral turpitude; (4) is alive; and (5) has not had his employment agreement with the company terminated because he failed to abide by a covenant to devote his primary business time and efforts to the company or because he has suffered an "incapacity."[1] At the time of the IPO, Partner Holdings received Class B stock that, if the Class B Condition was met, carried approximately a 96% voting interest in Moelis.

---

[1] App. to Opening Br. at A542.

B

In connection with the IPO, Moelis also entered into a stockholders agreement with Partner Holdings. The agreement grants Partner Holdings—controlled by Kenneth Moelis—substantial rights concerning Moelis's governance so long as the Class B Condition in the Moelis charter and a "Secondary Class B Condition"[2] defined in the agreement are met.

Section 2.1 of the stockholders agreement prohibits the Moelis board from making a number of fundamental decisions without the consent of Partner Holdings. Without Partner Holdings' consent, the Moelis board may not take any one of 18 actions enumerated in the stockholders agreement. A sample of actions that the board may not take without approval from Partner Holdings includes: taking on debt over $20 million; issuing more than a small amount of equity as defined by the agreement; issuing preferred stock; adopting a stockholder rights plan; amending the certificate of incorporation or by-laws; entering into a merger, consolidation, recapitalization, liquidation or sale of the company; removing or appointing officers; issuing or paying dividends; and adopting the company's annual budget.[3]

---

[2] The Secondary Class B Condition is substantively identical to the Class B Condition in the Moelis charter except that it requires that Kenneth Moelis own only 2,229,222 shares of Moelis Class A stock or its equivalent. App. to Opening Br. at A566.

[3] *See West Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 311 A.3d 809, 825 (Del. Ch. 2024) [hereinafter "*Moelis II*"]; App. to Opening Br. at A133–34.

Section 4.1 of the stockholders agreement provides Partner Holdings with extensive control over the Moelis board's composition. Section 4.1(a) permits Kenneth Moelis—through Partner Holdings—to designate a number of director nominees equal to a majority of the board. It further mandates that the Board use its best efforts to maintain a board of directors with no more than 11 seats. Section 4.1(c) compels the Moelis board to recommend that stockholders vote in favor of Partner Holdings designees for election to the Moelis board. It does so by mandating that the board include these designees in the slate of nominees it recommends to stockholders and "use its reasonable best efforts to cause the election of each such designee to the Board."[4] And Section 4.1(d) compels the Moelis board to fill any board vacancy arising from the departure or removal of a Partner Holdings designee with another Partner Holdings designee.

Section 4.2 of the stockholders agreement compels the Moelis board to staff its committees with Partner Holdings designees proportionate to the number of Partner Holdings designees on the board as a whole.

The stockholders agreement also has a severability provision, preserving the applicability of the remainder of the agreement should any provision be found invalid or unenforceable.

---

[4] *Moelis II*, 311 A.3d at 827; App. to Opening Br. at A135.

C

Moelis and Partner Holdings executed the stockholders agreement on April 15, 2014, the day before Moelis Class A stock began trading on the New York Stock Exchange. The IPO prospectus disclosed to public stockholders that the voting power of the Class B stock held by Partner Holdings and the content of the stockholders agreement with Partner Holdings would give Kenneth Moelis control of Moelis. The prospectus explained that "[u]pon completion of this offering, Moelis & Company will be controlled by Mr. Moelis, through his control of Partner Holdings" and that "Mr. Moelis will control approximately 96.8% of the voting interest in Moelis & Company."[5] The prospectus further explained that Kenneth Moelis "will have the ability to elect all of the members of our board of directors and thereby to control our management and affairs."[6] Another section of the prospectus plainly disclosed the Class B Condition and the approval rights held by Partner Holdings under Section 2.1 of the stockholders agreement.[7] Similar disclosures have appeared in each of Moelis's annual form 10-K reports following the IPO.

Since the IPO, Kenneth Moelis's voting power has fallen below 50%. And since April 2021, to ensure compliance with New York Stock Exchange rules for

---

[5] App. to Opening Br. at A455.
[6] *Id.*
[7] *Id.* at A468–70.

9

non-controlled companies, Partner Holdings has partially waived its rights under Section 4.1 of the stockholders agreement by designating only two director nominees for election to the company's board, which currently comprises five members. Partner Holdings has also waived its right to proportionate board-committee representation under Section 4.2 of the stockholders agreement.

D

In March 2023, the plaintiff, a Class A stockholder since November 2014, filed this lawsuit against Moelis claiming that the provisions of the stockholders agreement were facially invalid because they violate § 141 of the Delaware General Corporation Law (the "DGCL"). The complaint requested a declaratory judgment that these provisions are invalid and unenforceable. Moelis answered, arguing that the plaintiff's claims were either time-barred or unripe, and that even if they were justiciable, the challenged provisions were not facially invalid under § 141. Because there were no factual issues for the Court of Chancery to resolve, cross-motions for summary judgment followed.

The court resolved the summary judgment motions in two opinions. Its first opinion addressed Moelis's argument that the plaintiff's claim was time-barred under the equitable defense of laches and, in the alternative, that the plaintiff's claim

was unripe.[8]  The court concluded that, if the challenged provisions violate § 141(a) as the complaint alleged, then they are void and thus not subject to equitable defenses, including laches.[9]  The court added that, even if laches were an available defense, the plaintiff's claim was not time barred because, if the plaintiff was correct about the statutory violation, the wrong for which it sought a remedy was ongoing and therefore its claim did not accrue in 2014 as Moelis contended.  "For an ongoing statutory violation," the court determined, "policy interests support using either the continuing wrong method or the separate accrual method" under either of which the plaintiff did not delay unreasonably.[10]  Addressing Moelis's ripeness argument, and citing the Court of Chancery's opinions in *Abercrombie v. Davies*,[11] *Carmody v. Toll Brothers, Inc.*,[12] and *Moran v. Household International, Inc.*,[13] the court found that a facial challenge to governance documents of this nature is ripe for judicial review.[14]

In its second opinion, the Court of Chancery addressed the plaintiff's claim on its merits.[15]  After an extensive review of Delaware law, the court fashioned a test to determine whether a contract is an "internal governance arrangement" subject to

---

[8] *See West Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 310 A.3d 985 (Del. Ch. 2024) [hereinafter "*Moelis I*"].
[9] *Id.* at 994.
[10] *Id.* at 996.
[11] 123 A.2d 893 (Del. Ch. 1956), *rev'd on other grounds*, 130 A.2d 338 (Del. 1957).
[12] 723 A.2d 1180 (Del. Ch. 1998).
[13] 490 A.2d 1059 (Del. Ch. 1985).
[14] *Moelis I*, 310 A.3d at 1005.
[15] *See Moelis II*, 311 A.3d at 866.

the language of § 141, or an "external commercial agreement" not covered by the statute.[16] It concluded that the stockholders agreement was an "internal governance arrangement" and that therefore the challenged provisions were subject to Section 141.[17] And because some of the challenged provisions limited the managerial freedom of the Moelis board of directors "in a substantial way," the court concluded that they facially violated § 141(a) and declared them void and unenforceable.[18] The court later awarded the plaintiff $6 million in attorney fees.[19]

This appeal followed. Moelis argues that the Court of Chancery's conclusion that the plaintiff's claims were not time barred by laches was erroneous as was its determination that the challenged provisions are facially invalid. Moelis also contends that the Court of Chancery's award of attorney fees was an abuse of discretion. Because we agree with Moelis's timeliness argument, we need not address its contentions as to the facial validity of the challenged provisions. Our decision also dictates that the Court of Chancery's award of attorney fees be vacated.

---

[16] *Id.* at 828–30.

[17] *Id.*

[18] Specifically, the court invalidated the requirements in the stockholders agreement that the Moelis board: seek approval from Partner Holdings when making the various corporate decisions outlined in Section 2.1; recommend Partner Holdings designees to stockholders for election under Section 4.1(c); fill vacancies on the board caused by the departure of a Partner Holdings designee with another Partner Holdings designee under section 4.1(d); keep the size of the board below 11 members under Section 4.1(a); and grant Partner Holdings designees board committee representation proportionate to their board representation under Section 4.2. *Id.* at 870–77.

[19] *See West Palm Beach Firefighters' Pension Fund v. Moelis & Company*, C.A. No. 2023-0309 (Del. Ch. July 18, 2024) (TRANSCRIPT).

E

A full account of the history of this case and its probable effect on our corporate law would not be complete without a reference to the prompt legislative response to the Court of Chancery's decision. Three months after the court issued its merits opinion, legislation was introduced in the General Assembly to mitigate—if not annul—the effects of the court's opinion. Senate Bill 313, introduced on May 23, 2024, amends § 122 of the Delaware General Corporation law by adding a new § 122(18). Read together with the pre-existing statute, § 122(18) now provides, in relevant part

> Every corporation created under this chapter shall have power, whether or not so provided in the certificate of incorporation, to:
> . . . .
>
> (18) Notwithstanding § 141(a) of this title, make contracts with 1 or more current or prospective stockholders . . . in its or their capacity as such, in exchange for such minimum consideration as determined by the board of directors (which may include inducing stockholders or beneficial owners of stock to take, or refrain from taking, 1 or more actions); provided that no provision of such contract shall be enforceable against the corporation to the extent such contract provision is contrary to the certificate of incorporation or would be contrary to the laws of this State (other than § 115 of this title) if included in the certificate of incorporation. Without limiting the provisions that may be included in any such contracts, the corporation may agree to: (a) restrict or prohibit itself from taking actions specified in the contract, (b) require the approval or consent of 1 or more persons or bodies before the corporation may take actions specified in the contract (which persons or bodies may include the board of directors or 1 or more current or future directors, stockholders or beneficial owners of stock of the corporation), and (c) covenant that the corporation or 1

13

or more persons or bodies will take, or refrain from taking, actions specified in the contract (which persons or bodies may include the board of directors or 1 or more current or future directors, stockholders or beneficial owners of stock of the corporation). Solely for purposes of applying the proviso in the first sentence of this subsection, a restriction, prohibition or covenant in any such contract that relates to any specified action shall not be deemed contrary to the laws of this State or the certificate of incorporation by reason of a provision of this title or the certificate of incorporation that authorizes or empowers the board of directors (or any 1 or more directors) to take such action.[20]

Senate Bill 313 was passed by the Delaware Senate and House of Representatives in mid-June 2024 and was signed by the Governor on July 17, 2024, with an effective date of August 1, 2024. The original synopsis of the bill left little doubt that it was drafted and passed in response to the Court of Chancery's decision.[21] The General Assembly stipulated, however, that the amended statute "shall not apply to or affect any civil action or proceeding completed or pending on or before such date."[22] Thus, the enactment of new § 122(18) does not moot this appeal.

---

[20] 8 *Del. C.* § 122(18).

[21] The synopsis states that "[n]ew § 122(18) provides bright-line authorization for contractual provisions addressing the matter listed [in the amended statute], and therefore would provide for a different rule than the portion of the Moelis decision in which the Court held that contract provisions of this nature must be included in the certificate of incorporation to be valid." S.B. 313, 152nd Gen. Assemb. (Del. 2024).

[22] S.B. 313, 152nd Gen. Assemb. § 6 (Del. 2024). It could be argued that the General Assembly's adoption of Senate Bill 313 clarified or announced the public policy of Delaware, but the synopsis quoted in footnote 21 and this limitation on the application of Section 122(18) require us to ignore that public policy. This is a curious circumstance, but we have not considered the implications of Senate Bill 313 in deciding that laches bars the plaintiff's facial challenge.

II

We review the Court of Chancery's decision to grant summary judgment *de novo*.[23] Summary judgment is appropriate where there are no disputed issues of material fact, and the moving party is entitled to judgment as a matter of law.[24] Here, there are no disputed facts. Our review of the Court of Chancery's "interpretation and application of legal precepts" and its application of the doctrine of laches is *de novo*.[25]

III

A

When a plaintiff advances a legal claim and seeks relief that would be available from a court of law, a court will apply the relevant statute of limitations to determine the timeliness of the claim.[26] But "the limitations of actions applicable in a court of law are not controlling in equity."[27] "A court of equity moves upon considerations of conscience, good faith, and reasonable diligence[,]"[28] so, when a plaintiff advances an equitable claim or a legal claim seeking equitable relief, the Court of Chancery will instead apply the doctrine of laches to determine the

---

[23] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 112 (Del. 2020).
[24] *Id.*
[25] *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 768 (Del. 2013).
[26] *See Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009).
[27] *Id.*
[28] *Id.*

timeliness of the claim.[29]  In other words, in equity, "[l]aches is an affirmative defense that the plaintiff unreasonably delayed in bringing suit after learning of an infringement of his or her rights."[30]

Laches has three elements:  "first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, resulting prejudice to the defendant."[31]  "In determining whether an action is barred by laches, the Court of Chancery will normally, but not invariably, apply the period of limitations by analogy as a measure of the period of time in which it is reasonable to file suit."[32]  Absent unusual circumstances, a plaintiff who files a claim within the analogous limitations period has presumptively filed within a reasonable time, while a plaintiff who files after the expiration of the analogous limitations period has presumptively

[29] *See* 2 Donald J. Wolfe, Jr. & Michael A. Pittinger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 15.07[d] (2d ed. 2021) [hereinafter "Wolfe & Pittinger"].
[30] *Levey*, 76 A.3d at 769.
[31] *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005) (citation omitted).  We note that this Court in *Levey v. Brownstone Asset Management LP* and the Court of Chancery in numerous decisions quoting *Levey*, including this case, have adopted a two-element formulation of the doctrine of laches under which a defendant must show "(i) unreasonable delay in bringing a claim by a plaintiff with knowledge thereof, and (ii) resulting prejudice to the defendant."  *Levey*, 76 A.3d at 769.  As a practical matter, a court's analysis under this formulation of the doctrine is identical to the analysis under the three-element formulation described in *Homestore* because the requirement that a claimant have knowledge of its claim is simply incorporated into the first element of the two-element formulation.  For the sake of consistency in our caselaw, however, we adopt here and reaffirm the three-element formulation of the doctrine as it possesses the superior historical pedigreein this Court and the Court of Chancery.  Leading treatises on Delaware law also cite the three-element formulation of the doctrine. *See, e.g.*, 2 Wolfe & Pittinger § 15.07[a][1]; Edward P. Welch, Edward B. Micheletti, Peter B. Morrison & Stephen D. Dargitz, *Mergers & Acquisitions Deal Litigation under Delaware Corporation Law* § 1.01[B] (2022 supplement).
[32] *Levey*, 76 A.3d at 769.

delayed unreasonably.[33]  Before we reach this analysis, however, we must determine whether the equitable defense of laches is available to Moelis at all.

B

As mentioned, the Court of Chancery concluded that, "[if] the Challenged Provisions violate § 141(a), then they are void" and that "[e]quitable defenses, including laches, cannot validate void acts."[34]  The premise of this conclusion—that a corporate action taken in a manner that is at odds with the DGCL is necessarily void rather than voidable—is inconsistent with our cases that draw a distinction between void and voidable contractual provisions.

But before discussing the cases we deem most helpful in untangling the knotty distinction between void and voidable contracts, we stress that, by drawing this distinction—one that has long vexed courts and legal scholars alike—we are not assessing the enforceability of the challenged provisions.  Both void and voidable contracts are unenforceable to one extent or another.[35]  Having thus qualified the scope of our inquiry, we turn to whether the challenged provisions are void and immune from equitable defenses or merely voidable and thus subject to equitable defenses.

---

[33] *Id.*
[34] *Moelis I*, 310 A.3d at 994.
[35] Restatement (Second) of Contracts §8 cmt a. (1981) ("Voidable contracts might be defined as one type of unenforceable contract.")

Our analysis proceeds from the premise that not all contracts that conflict with positive law are void.[36] As one treatise observes, "[t]here are degrees of evil and illegality. Some bargains are said to be *malum in se*, while others are *malum prohibitum*."[37] Those that are *malum in se*—that is, "so malignantly bad that any party to it deserves no help from the law"[38]—are generally said to be void *ab initio*, while those that are merely *malum prohibitum* "(relating to regulation) . . . are often treated as voidable."[39]

This distinction is implicit in our decisions that differentiate void from voidable contracts in the corporate-governance context. From those cases, we conclude that, to determine whether a contract is void as *ultra vires* or against public policy, courts should focus on the subject matter of the contract. This principle was followed in *CompoSecure, L.L.C. v. CardUX, LLC*, in which we noted that "[t]he common law rule is that void acts are *ultra vires* and generally cannot be ratified, but voidable acts are acts falling within the power of a corporation, though not properly authorized, and are subject to equitable defenses."[40] We derived this

---

[36] *XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 652 n.60 (Del. Ch. 2022) (hereinafter "*XRI I*") (holding that "[n]ot all contracts that exceed the bounds of law are void *ab initio*.").

[37] 3 Eric M. Holmes, *Corbin on Contracts*, § 9.27 (Joseph Perillo ed., rev. ed 1996).

[38] *Id.*

[39] Jesse A. Schaefer, Comment, *Beyond a Definition: Understanding the Nature of Void and Voidable Contracts,* 33 Campbell L. Rev. 193, 200-01 (2010).

[40] 206 A.3d 807, 816–17 (Del. 2018).

statement from two earlier cases, *Klaassen v. Allegro Development Corp.*[41] and

*Michelson v. Duncan.*[42] In *Klaassen*, we held that board action—removal of the

company's CEO—"taken in violation of equitable principles is voidable, not void,

because '[o]nly voidable acts are susceptible to . . . equitable defenses.'"[43] The

*Klaassen* court, recognizing "the well-established distinction between void and

voidable corporate actions[,]" quoted *Michelson*:

> The essential distinction between voidable and void acts is that the
> former are those which may be found to have been performed in the
> interest of the corporation but beyond the authority of management, as
> distinguished from acts which are *ultra vires*, fraudulent or gifts or
> waste of corporate assets.[44]

*Michelson* noted that "[t]he practical distinction . . . is that voidable acts are

susceptible to cure by shareholder approval while void acts are not."[45] It also bears

repeating that *Michelson* recognized the difference between actions that are beyond

the authority of corporate fiduciaries to take from actions that are *ultra vires* the

corporation—that is, beyond the corporation's power to take. In this regard, it is

equally important to remember that, although *ultra vires* acts can in some contexts

---

[41] 106 A.3d 1035 (Del. 2014).

[42] 407 A.2d 211 (Del. 1979).

[43] *Klaassen*, 106 A.3d at 1046 (quoting *Boris v. Schaheen*, 2013 WL 6331287, at *15 (Del. Ch. Dec. 2, 2013)). Admittedly, the claim in *Klaassen*—that the CEO's removal was a violation of "generally accepted notions of fairness"—is distinguishable from the plaintiff's claim of statutory invalidity in this case. We cite it here because of its articulation of the difference between void and voidable acts.

[44] *Id.* (quoting *Michelson*, 407 A.2d at 218–19).

[45] *Michelson*, 407 A.2d at 219 (citation omitted).

19

be defined broadly, "[i]n the context of defining void acts, *ultra vires* acts fall under a much more narrow definition which includes acts specifically prohibited by the corporation's charter, for which no implicit authority may be rationally surmised, or those acts contrary to basic principles of fiduciary law."[46]

In *Nevins v. Bryan*,[47] the Court of Chancery applied these principles, and this Court affirmed. In *Nevins*, the court addressed a claim that, because the notice of a special meeting of members was faulty, actions taken at the meeting were not only invalid—an assertion the court deemed correct—but "void rather than voidable."[48] After quoting the same excerpt from *Michelson* that we have quoted above, the court explained further

> Void acts are not ratifiable because the corporation cannot, in any case, lawfully accomplish them. Void acts are illegal acts or acts beyond the authority of the corporation. In contrast, voidable acts are ratifiable because the corporation can lawfully accomplish them if it does so in the appropriate manner.[49]

Because all the disputed actions taken at the meeting could have been accomplished lawfully by the defendants had they done them in the proper manner—

---

[46] *Solomon v. Armstrong*, 747 A.2d 1098, 1114 n.45 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000).

[47] 885 A.2d 233 (Del. Ch. 2005), *aff'd*, 884 A.2d 512 (Del. 2005).

[48] *Nevins*, 885 A.2d at 245.

[49] *Id*. (footnotes and quotation marks omitted). This analysis might differ in the alternative entity context where parties receive even greater leeway in private ordering, and we have held that an entity's constituent documents may provide that certain actions taken by the entity or its management are incurably void. *See Holifield v. XRI Inv. Hldgs., LLC*, 304 A.3d 896, 924–26 (Del. 2023) (hereinafter "*XRI II*"); *CompoSecure*, 206 A.3d at 817.

20

that is, with proper notice—the actions were deemed voidable, not void, and therefore subject to the equitable defenses of laches and acquiescence.

ii

The question to be answered under this framework for distinguishing between void and voidable acts then is not whether the method actually chosen by the Moelis board to implement the challenged provisions was valid under the DGCL. Instead, we evaluate whether the plaintiff has demonstrated that there are no lawful means by which Moelis could accomplish its desired governance arrangements, making the challenged provisions susceptible to cure and therefore voidable. This framework appropriately considers whether the arrangements agreed to in a challenged contract are themselves contrary to public policy instead of whether the means by which they are agreed to are at odds with public policy.

Yet the Court of Chancery did not consider the distinction between void and voidable acts as drawn in *CompoSecure*, *Klaassen*, *Michelson*, and *Nevins*.[50]

---

[50] This is not a criticism of the Court of Chancery. Despite the issue's centrality to the court's eventual determination that equitable defenses to the plaintiff's claims were not available because the Challenged Provisions were void, it was afforded scant treatment in the parties' briefs in the Court of Chancery. Indeed, when Moelis invoked § 8106's three-year limitations period in its motion for summary judgment, the plaintiff's response focused on accrual principles, relying heavily on *Collis*, *Ebix*, and *Politan Management* discussed in Section III(C). Only in passing did the plaintiff cite *Price Dawe* and the Court of Chancery's decision in *XRI I* in support of a conclusory assertion that the challenged provisions were void *ab initio*. App. to Opening Brief at A1135. In its reply brief Moelis, in turn, pointed out that *XRI I* refuted the plaintiff's assertion. *XRI I*, Moelis noted, recognized that courts are "reluctant" to find contracts *void ab initio* and that "[n]ot all contracts that exceed the bounds of the law are void *ab initio.*" *Id.* at A1626 (quoting *XRI I*, 283 A.3d at 652 & n.60). It further cited *XRI I*'s recognition of the distinction between

21

Instead, the court pointed to our decision in *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust*,[51] which involved a stranger-initiated life insurance policy that lacked an insurable interest. This Court held that such a policy "is void *ab initio* because it violates Delaware's clear public policy against wagering."[52] That the subject matter of the wager was the life expectancy of the insured added to the unseemliness of the scheme under which the policy was originated. Extrapolating from this refusal to enforce a contract whose subject matter was illegal, the Court of Chancery devised a categorical rule that renders void—as opposed to voidable—any contractual provision adopted in a manner that exceeds the board's or management's authority even if the provision could be ratified or enacted in an authorized manner. That rule is, in our view, inconsistent with our precedent and the general principles discussed above.

iii

In its later opinion addressing the facial validity of the challenged provisions, but not in its opinion addressing the timeliness of the plaintiff's complaint, the Court of Chancery acknowledged that Kenneth Moelis "could have accomplished the vast

---

contracts that are *malum in se* and those that are *malum prohibitum*. At oral argument on the summary judgment motions, the discussion of this issue was equally brief, with both sides agreeing that the *malum in se/malum prohibitum* dichotomy was apt, but with each side claiming that it favored their position. For Moelis, the stockholders agreement was not "an affront to public policy," *id*. at A1706, and therefore not *malum in se* while the plaintiffs said the opposite, *id.* at A1750.

[51] 28 A.3d 1059 (Del. 2011).

[52] *Id.* at 1067–68. This Court relied upon the quoted language in *XRI I*. 283 A.3d at 651.

22

majority of what he wanted through the Company's certificate of incorporation."[53] The court also posited that the Moelis board could have used its blank check authority to issue Moelis preferred stock conveying voting and director-appointment rights. The certificate of designations for this preferred stock would become part of the certificate of incorporation by operation of law under § 104 of the DGCL. Put differently, the court recognized that the challenged provisions were not beyond the power of the corporation to enact so long as the method of enactment did not run counter to the DGCL.[54]

We grant that the court's discussion of alternative methods that Moelis might employ to accomplish the governance arrangements established in the stockholders agreement did not provide a ringing endorsement of those methods as to each and every governance provision. But that appears to be the product of the plaintiff's failure in the trial court to engage in any meaningful way with the distinction

---

[53] *Moelis II*, 311 A.2d at 822. *See also* 8 *Del. C.* § 102(b); *CCSB Fin. Corp. v. Totta*, 302 A.3d 387, 399 (Del. 2023) (quoting *Williams v. Geier*, 671 A.2d 1368, 1381 (Del. 1996)) (noting that "[t]he DGCL 'is a broad enabling act which leaves latitude for substantial private ordering, provided the statutory parameters and judicially imposed principles of fiduciary duty are honored.'").

[54] In a footnote, the Court of Chancery qualified its acknowledgement that Kenneth Moelis "could have accomplished the vast majority of what he wanted through the Company's certificate of incorporation." *Moelis II*, 311 A.2d at 822. The court noted that "[Kenneth] Moelis may not be able to get everything he wanted" and that "[e]ven a charter provision cannot override a mandatory feature of the DGCL." *Id*. at 822 n.19. The court then speculated as to whether certain charter provisions restricting a board's powers might not be viable but stopped short of saying that any of the challenged provisions in this case would not be viable if included in Moelis's charter. For the court, "those issues are for another day." *Id*.

23

between void and voidable acts. For the plaintiffs, that the challenged provisions violate § 141 was enough, and the Court of Chancery agreed; we do not.

iv

The DGCL provides broad authority, albeit subject to certain mandatory terms, for private ordering.[55] As the plaintiff here emphasizes, it is true that, under § 141(a), "[t]he business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation." Even so, § 102(b) permits charter provisions "for the management of the business and for the conduct of the affairs of the corporation . . . creating, defining, limiting and regulating the powers of the corporation, the directors and the stockholders . . . if such provisions are not contrary to the laws of this State." Hearkening back to *Sterling v. Mayflower Hotel Corp.*,[56] then-Vice Chancellor Strine observed in *Jones Apparel Group, Inc. v. Maxwell Shoe Co., Inc.* that "'contrary to the laws of this State' has a narrow and historically accepted meaning."[57] Under that meaning, charter provisions may not "transgress a statutory enactment or a public policy

[55] For a discussion of the limits of private ordering, *see* Jill E. Fisch, *Stealth Governance: Shareholder Agreements and Private Ordering*, 99 Wash. U. L. Rev. 913, 923–26 (2021); *see also In re Appraisal of Ford Hldgs., Inc. Preferred Stock*, 698 A.2d 973, 976 (Del. Ch. 1977) (noting that modern corporation law is enabling in character containing few mandatory terms and listing certain of the DGCL's mandatory terms).
[56] 93 A.2d 107 (Del. 1952).
[57] 883 A.2d 837, 843 (Del. Ch. 2004).

settled by the common law or implicit in the General Corporation [Law] itself."[58] A provision would "transgress" in the sense used in *Sterling* if it "vitiates or contravenes . . . a mandatory rule of our corporate code or common law."[59]

v

Here, it was the plaintiff's burden to demonstrate that the challenged provisions were void.[60] In the Court of Chancery, as previously mentioned, the plaintiff's response to Moelis's contention that the provisions were, if anything, voidable but not void, was cursory. And in its answering brief in this Court, plaintiff's argument relied almost exclusively on *Price Dawe* and its holding that stranger-originated life insurance policies—wagers on human life—are void *ab initio*. But the illegality in *Price Dawe*, as we have previously explained, is different in kind than the alleged violation of § 141(a) at issue here.

Unsatisfied with the parties' treatment of the issue and to shed light on whether the challenged provisions could be lawfully implemented by a means other

---

[58] *Id*. (quoting *Sterling*, 93 A.2d at 118).

[59] *Id*. at 846.

[60] Citing *Salzberg v. Sciabacucchi*, 227 A.3d 102, 113, (Del. 2020), the Court of Chancery cited the burden of persuasion that applies to facial challenges. "To succeed on a facial challenge," the court wrote, "the plaintiff must show that the Challenged Provisions cannot operate lawfully 'under any circumstances.'" *Id*. The court did not address the burden applicable to a claim that a contractual provision is void as against public policy. Nor have we found any Delaware precedent explicitly addressing this point. But courts from other jurisdictions place the burden on the party claiming voidness. *See, e.g.*, *Wash. Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 477 (9th Cir. 1969) ("[T]he party who asserts the illegality of the contract bears the burden of proof on that point."); *Colburn Fam. Found. v. Chabad's Child of Chernobyl*, 739 F. Supp. 2d 614, 618 (S.D.N.Y 2010) ("The party seeking to void a contract bears the burden of proving that the contract violates public policy.").

than a stockholders agreement, we requested supplemental briefing and asked the parties to "[i]dentify the challenged provisions of the Moelis stockholders agreement that are within the power of the corporation to adopt so long as the method of adoption is not prohibited by the DGCL."[61]

In response, Moelis asserted, among other things, that each of the challenged provisions "could have been lawfully implemented through the certificate of incorporation under § 102(b)(1) and § 141(a) of the DGCL."[62] The plaintiff countered with an array of reasons why the provisions might operate inequitably under certain circumstances. But the plaintiff failed to identify any mandatory provision of the DGCL or other Delaware law that would stand in the way of the adoption of the challenged provisions by charter amendment or other method. Consequently, we conclude that the plaintiff has not carried its burden of establishing that the challenged provisions are void. We thus conclude that, to the extent that they are at odds with § 141(a), they are voidable, not void. Hence, the plaintiff's claim that the provisions are facially invalid is subject to equitable defenses, including laches.

---

[61] Letter from Clerk to Counsel Requesting Suppl. Briefing, Aug. 5, 2025, D.I. 37.
[62] Suppl. Opening Br. at 1.

C

We turn next to the Court of Chancery's determination that, "[a]ssuming laches could apply, the plaintiff did not wait too long to sue."[63] As we mentioned before, in determining whether a plaintiff has delayed unreasonably in bringing an equitable claim, our courts consult the statutory limitations period for bringing an analogous legal claim. According to Moelis, the analogous statutory limitations period is found at 10 *Del. C.* § 8106, under which covered actions must be brought within three years "from the accruing of the cause of such action[.]" The plaintiff does not argue otherwise. Instead, the plaintiff argues that the challenged provisions did not "accrue" in 2014 when the challenged provisions were adopted. If the claim accrued in 2014, there would be little doubt that the plaintiff's delay in filing suit was unreasonable. The plaintiff avoided that unhappy result by persuading the Court of Chancery that it should not view the adoption of the challenged provisions in 2014 as the point in time when the plaintiff's claim arose. Instead, the plaintiff successfully argued below that the court should apply what is known as the "continuing wrong" method for determining when its cause of action accrued.

A cause of action accrues—and, thus, the statute of limitations begins to run—upon the commission of the wrongful act giving rise to the cause of action.[64] Moelis

---

[63] *Moelis I*, 310 A.3d at 992.

[64] *ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 732–33 (Del. 2020); *see also Walmart Stores, Inc. v. AIG Life Ins. Co.*, 820 A.2d 312, 319 (Del. 2004).

27

contends that, because the plaintiff's claims attack the facial validity of the stockholders agreement and its grant of contractual control rights that conflict with § 141(a) of the DGCL, the allegedly wrongful act giving rise to those claims was the execution of the stockholders agreement in April 2014. Under this view, the plaintiff's complaint—filed nine years later—was untimely.

The plaintiff countered that the stockholders agreement resulted in "the ongoing management of the corporation in an unlawful manner."[65] Citing the Court of Chancery's opinion in *Lebanon County Employees' Retirement Fund v. Collis*,[66] the plaintiff urged the court to conceive this state of affairs "as a continuing wrong for which 'the limitations period does not begin to run, until the continuing wrong ceases' or, alternatively, 'as a sequence of wrongful acts, each of which gives rise to a separate limitations period.'"[67] The Court of Chancery agreed with the plaintiff and determined in consequence that the plaintiff had not delayed unreasonably in bringing this action.

i

Like the plaintiff, the Court of Chancery relied on its discussion of accrual principles in *Collis*. In that case, the court identified three methods our courts have used to determine when claims for breach of fiduciary duty accrue. In its opinion

---

[65] App. to Opening Br. at A1751.
[66] 287 A.3d 1160 (Del. Ch. 2022).
[67] App. to Opening Br. at A1133 (quoting *Collis*, 287 A.3d at 1179).

here, the court labeled those methods as the "discrete act" method, the "continuing wrong" method, and the "separate accrual" method. In *Collis*, the court recognized that "[t]he discrete act method applies in the vast majority of cases[]" and that, correspondingly, the other two methods apply "more rarely."[68] For various reasons, in this case the court rejected the usual approach in favor of its application of the more rarely applied "continuing wrong" method. Our task is to discern whether this choice was appropriate.

The Court of Chancery observed—accurately, in our view—that "[t]he discrete act method applies when a claim arises at a distinct point in time and is effectively complete as of that date, even if it has ongoing effects or implications."[69] The plaintiff's claim in this case appears to fit neatly within this framework. The Company entered into the challenged stockholders agreement in 2014 and, later that year, the plaintiff acquired its Class A common stock in the Company. These are distinct points in time. To be sure, the plaintiff alleges that the Moelis board's entry into the stockholders agreement exceeded its statutory authority and clashed with § 141(a), thereby begetting an ongoing statutory violation. But this suggests nothing

---

[68] *Collis*, 287 A.3d at 1178. *See also TRW Inc. v. Andrews*, 534 U.S. 19, 37 (2001) (Scalia, J. concurring) (observing that the statement that a statute of limitations begins to run when the right of action is complete is "unquestionably the traditional rule").

[69] *Moelis I*, 310 A.3d at 994.

29

more than that the purportedly unlawful act—the execution of the stockholders agreement—has ongoing effects or implications.

The Court of Chancery saw it differently; for it, the existence of the stockholders agreement constitutes an ongoing statutory violation. The court viewed the essence of the plaintiff's claim to be that "the on-going existence of the Challenged Provisions violates § 141(a) . . . [such that] [e]very moment that the Company's board operates under the constraints of the Challenged Provisions interferes with the directors' authority."[70] This, in the court's eyes, weighed in favor of employing either the continuing-wrong method or the separate-accrual method to determine when the plaintiff's claims accrued. This move loosed the plaintiff's claims from the bonds of what otherwise appeared to be a case-ending time bar. Our review of case law from this jurisdiction and generally accepted claim-accrual principles persuades us that the Court of Chancery erred on this point.

We begin our critique of the Court of Chancery's accrual analysis with a review of a trio of Court of Chancery opinions that apply a more defensible approach to claim accrual under circumstances similar to those in this case. After that, we explain why the cases upon which the Court of Chancery and the plaintiff have relied are either distinguishable or unpersuasive.

---

[70] *Id*. at 996.

In *Kahn v. Seaboard Corp.*,[71] the Court of Chancery addressed a statute-of-limitations defense in a derivative action in which the plaintiff alleged that the defendants used their control over the corporation to require the corporation to enter into numerous transactions with one of the defendants (Seaboard Flour Corporation) to its benefit and the corporation's detriment. The contract underlying the transactions was a ten-year charter entered into in 1986, which required the corporation to pay management fees and other costs to Seaboard Flour in the years ahead. The fees were paid in 1986 and 1987, but the plaintiff did not sue until 1990, outside § 8106's three-year statute of limitations. When the defendants moved to dismiss the complaint, the plaintiff resisted, contending that "the wrongs allegedly arising from the 1986 time charter [were] continuing wrongs that are not barred by applicable limitation provisions in any event."[72]

Chancellor Allen rejected the plaintiff's continuing-wrong theory in clear terms:

> The facts alleged, if they constitute a wrong, do not, in my opinion, constitute a continuing wrong for purposes of analyzing a limitations bar. The wrong attempted to be alleged is the use of control over Seaboard to require it to enter into a contract that was detrimental to it and beneficial, indirectly, to the defendants. Any such wrong occurred at the time that enforceable legal rights against Seaboard were created. Suit could have been brought immediately thereafter to rescind the contract and for nominal damages which are traditionally available in

---

[71] 625 A.2d 269 (Del. Ch. 1993).
[72] *Id*. at 270–271.

contract actions. Complete and adequate relief, if justified, could be shaped immediately or at any point thereafter.[73]

The court noted further that, unlike the typical continuing-wrong claim, "the only liability matter to be litigated involves defendants' 1986 actions in authorizing the creation of these contract rights and liabilities."[74] Put differently, the corporation's performance under the contract was not a continuing wrong, even if the manner in which the contract was created might have been wrongful.

Here, the Court of Chancery chose not to follow this reasoning despite its seeming applicability to the accrual issue before it. The court distinguished *Kahn* and other similar cases,[75] observing that they "involve as-applied fiduciary duty challenges to the decision to enter into the contract [][,] and [n]one involved statutory challenges and assertions of ongoing illegality."[76] The court did not address, however, the gravamen of the plaintiff's claim, which focuses more on the manner in which the challenged provisions were adopted—that is, by contract rather than by charter, preferred stock designations, or other permitted device—than on any wrongful acts committed by the defendant within the three-year limitations period. Nor did the court grapple with the fact that complete and adequate relief was

---

[73] *Id*. at 271.
[74] *Id*.
[75] *HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2022 WL 3010640 (Del. Ch. July 29, 2022); *In re Sirius XM S'holder Litig.*, 2013 WL 5411268 (Del. Ch. Sept. 27, 2013); *Kahn v. Seaboard Corp.*, 625 A.2d 269 (Del. Ch. 1993); *Tchrs.' Ret. Sys. Of La. v. Aidinoff*, 900 A.2d 654 (Del. Ch. 2006).
[76] *Moelis I*, 310 A.3d at 998.

available to the plaintiff during the three years following the execution of the stockholders agreement.

The Court of Chancery was equally unpersuaded by Moelis's reliance on *Kraft v. WisdomTree Investments, Inc.*,[77] a 2016 Court of Chancery decision in a declaratory judgment action in which the plaintiff alleged that a stock issuance from 15 years earlier was void for failing to comply with § 152 of the DGCL. Chancellor Bouchard applied § 8106's three-year statute of limitations period "by analogy" and dismissed the plaintiff's claim, noting that the three-year limitations period "begins to run from the time of the wrongful act,"[78] which took place when the stock was, according to the complaint, wrongfully issued 12 years before suit was filed. Here, the Court of Chancery found *Kraft* unpersuasive because the *Kraft* defendants cited cases about voidable acts and, after *Kraft* was decided, more recent precedent, including *XRI II*, clarified that equitable defenses such as laches "cannot validate void acts."[79] In light of our conclusion above that the court erroneously categorized the challenged provisions as void, instead of voidable, the court's rationale for sidestepping *Kraft* loses whatever force it may otherwise have had.

---

[77] 145 A.3d 969 (Del. Ch. 2016).
[78] *Id.* at 989.
[79] *Moelis I*, 310 A.3d at 999 (citing *XRI II*, 304 A.3d at 916).

Which brings us to *Kerns v. Dukes*,[80] a 2004 Court of Chancery opinion, which neither the parties nor the court cited in this case. In *Kerns*, the plaintiffs filed an action challenging Sussex County's expansion of a sanitary sewer system. The plaintiffs alleged that the County's action circumvented the requirements of 9 *Del. C.* Ch. 65 governing sanitary and water districts and thereby violated the procedural and substantive due-process rights of Sussex County residents. The complaint alleged due-process violations under both the United States and Delaware constitutions and under 42 U.S.C. § 1983 and § 1988 when the County created the sewer district by resolution in March 1990. The plaintiffs also brought a claim based on the County's alleged Title 9 violation. Although the Sussex County Council adopted the resolution establishing the sewer district in 1990, it did not begin mailing capitalization fee bills and complete construction of the first two phases of the district until 1995. The plaintiff filed suit in the federal district court on March 4, 1996.[81]

---

[80] 2004 WL 766529 (Del. Ch. Apr. 2, 2004).

[81] The *Kerns* case in federal court was dismissed on federal-state comity and federal subject-matter jurisdiction grounds. *See Kerns v. Dukes*, 944 F. Supp. 1214, 1216 (D. Del. 1996). On appeal to the United States Court of Appeals for the Third Circuit, that court certified a question of law to this Court concerning the jurisdiction of Delaware's trial courts to hear the case. *Kerns v. Dukes*, 707 A.2d 363, 365 (Del. 1998), *overruled in part by Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665 (Del. 2013). We determined that the Court of Chancery had subject-matter jurisdiction encompassing the plaintiff's claims. *Kerns*, 707 A.2d at 365. Following our decision, the Court of Appeals for the Third Circuit affirmed the dismissal of the case in federal court, and the plaintiffs brought their case anew in the Court of Chancery. *See Kerns v. Dukes*, 153 F.3d 96, 98 (3d Cir. 1998).

The County moved to dismiss, arguing that the plaintiffs' civil rights claims were barred by the two-year statute of limitations found in 10 *Del. C.* § 8119. In considering the County's motion, the court identified "[t]he critical issue for purposes of the application of the statute of limitations":[82] whether the plaintiffs' injury accrued when the County passed the resolution "expanding" the sewer district in March 1990 or not until the residents were assessed costs in July 1995.

The plaintiffs sought to defeat the County's motion by arguing that the County's creation of and assessment for the expanded sewer district were continuing wrongs. The Court of Chancery made short work of that argument:

> Not surprisingly, Plaintiffs seek to save their cause of action by arguing that the creation of and assessments for the WRE were continuing wrongs. If there is a continuing wrong, the cause of action is timely so long as the last act evidencing the continuing wrong falls within the limitations period. That is, the cause of action does not accrue until the last act of the continuing wrong. Generally, all the elements of a cause of action must be present before the cause of action will accrue. However, where suit can be brought immediately and complete and adequate relief is available, a cause of action cannot be tolled as a continuing violation. The only element missing from Plaintiffs' cause of action at the time the Resolution passed was significant money damages giving Plaintiffs an incentive to bring their action. Injunctive relief, however, was available to *prevent* or reduce any damages. The [existence of the sewer district] is not a continuing wrong. The wrong, if any, was the Sussex County Council's adoption of the Resolution to create the [sewer district] on March 22, 1990, and its failure to classify it as a new district and hold an election six months thereafter.

---

[82] *Kerns*, 2004 WL 766529, at *4.

35

On their face, Plaintiffs' civil rights claims are time barred.[83]

In reaching this conclusion, the court relied on *Kahn* and an opinion of the Third Circuit Court of Appeals, *Cowell v. Palmer Township*,[84] a § 1983 action alleging that a township's imposition of two municipal liens violated the Takings Clause and the Due Process Clause of the United States Constitution, as well as various state laws. The liens were imposed in 1992 and 1993, but the plaintiffs did not file their complaint until 1999. Conceding that the applicable statute of limitations for their § 1983 claims was two years, the plaintiffs argued that the continuing-violations doctrine should apply to toll the limitations period "because the defendants engaged in a 'continuing campaign of affirmative acts' that interfered with their substantive due process rights."[85] The Third Circuit Court of Appeals rejected the plaintiffs' argument, explaining—relevant to our analysis here—that "[a] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation."[86]

In our view, the three Court of Chancery opinions discussed above point in a decidedly different direction than the one taken by the Court of Chancery here on the issue of when the plaintiff's cause of action accrued. We turn next to an

---

[83] *Id.* at *4–5.
[84] 263 F.3d 286 (3d Cir. 2001).
[85] *Id.* at 292 (citation omitted).
[86] *Id.* at 293 (quoting *Ocean Acres Ltd. v. Dare Cnty. Bd. of Health*, 707 F.2d 103, 106 (4th Cir. 1983)).

examination of the court's reasons for taking the path it did, starting with the earlier Court of Chancery decisions it relied upon, followed by the policy concerns the court identified as weighing in favor of its accrual analysis.

ii

The cases the Court of Chancery cited in support of its application of the continuing-wrong doctrine are less than compelling. For instance, it does not appear as though the court in *Abercrombie v. Davies*[87] was confronted with a laches defense. And in *Politan Capital Management, LP v. Masimo Corp.*,[88] a bench ruling announced contemporaneously with this case, the court's laches analysis was conducted based on the allegations in the complaint at the motion to dismiss stage. As the *Politan* court noted, laches is "'not ordinarily well-suited for treatment' on a motion to dismiss"[89] because the court may only dismiss the complaint if, based on the facts alleged in the complaint, "it is not possible that [the claim] could be untimely."[90] Put another way, the *Politan* court was faithfully applying our guidance in *Reid* that "[u]nless it is clear from the face of the complaint that an affirmative defense exists and the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate."[91] Additionally, the

---

[87] 123 A.2d 893 (Del. Ch. 1956).
[88] C.A. No. 2022-0948-NAC (Del. Ch. Feb. 3, 2023) (TRANSCRIPT).
[89] *Id.* at 186 (quoting *Reid*, 970 A.2d at 183).
[90] *Id.*
[91] *Reid*, 970 A.2d at 183–84.

complaint in *Politan* alleged that the challenged agreement—in that case an employment agreement containing a provision that was alleged to be *ultra vires* or corporate waste, claims the court deemed reasonably conceivable—had been amended twice since its inception, and, according to the court, it was reasonably conceivable that these amendments could have "made the provision even more troubling."[92] Although the *Politan* court did consider the agreement's continued existence to be relevant to its laches analysis and suggest that the application of an alternative accrual doctrine might be warranted, the opinion's appropriate reluctance to dismiss a claim on the grounds of an affirmative defense under Court of Chancery Rule 12(b)(6) limits its persuasive value.

Finally, the laches analysis in both this case and in *Politan* relied on *In re Ebix, Inc. Stockholder Litigation.*[93] In that case, the court held that a challenge to the adoption of a corporate contract that the plaintiffs alleged was an unreasonable anti-takeover device was barred by laches. It did, however, allow the plaintiffs to pursue their breach-of-fiduciary duty claim based on the defendant's ongoing improper maintenance of the contract as an anti-takeover device. The opinion makes no mention, however, of the continuing-wrong doctrine, the separate-accrual method, or any other measure for determining when the plaintiffs' cause of action

---

[92] *Politan*, C.A. No. 2022-0948-NAC, at 188.
[93] 2014 WL 3696655 (Del. Ch. July 24, 2014).

accrued beyond the statement that "[t]his claim is timely because the alleged injury is ongoing."[94] The authority supporting the *Ebix* court's conclusion was a single case: this Court's opinion in *Moran v. Household International, Inc.*[95] At issue in *Moran* was the validity of the adoption of a stockholder rights plan. This Court determined that the adoption of the plan was protected by the business judgment rule but noted that

> [w]hile we conclude for present purposes that the Household Directors are protected by the business judgment rule, that does not end the matter. The ultimate response to an actual takeover bid must be judged by the Directors' actions at that time, and nothing we say here relieves them of their basic fundamental duties to the corporation and its stockholders. *Their use of the Plan will be evaluated when and if the issue arises*.[96]

This language, in our view, stands only for the proposition that where board action is properly taken, as was the case in *Moran*, or where a challenge to that board action is otherwise unavailable, later as-applied challenges are possible and those causes of action may accrue separately based on subsequent board action. *Moran* did not address the doctrine of laches or the claim-accrual principles at issue here.

In short, on the issue we are now addressing, *Abercrombie*, *Politan*, and *Ebix* provide an insufficient counterweight to the accrual principles enunciated in *Kahn*, *Kraft*, and *Kerns*.

---

[94] *Id.* at *11.
[95] 500 A.2d 1346 (Del. 1985).
[96] *Id.* at 1357 (emphasis added) (internal citations omitted).

D

Although we have concluded that the challenged provisions are voidable, permitting Moelis to raise the equitable defense of laches, and that the plaintiff's claim accrued in 2014, these conclusions do not complete our analysis. We must also evaluate whether Moelis would be prejudiced were it forced to defend this lawsuit.

Under the principles identified earlier,[97] the plaintiff has presumptively delayed unreasonably in bringing its claim against Moelis by filing it well outside the analogous limitations period of § 8106. Typically, after the analogous statute of limitations has run, "defendants are entitled to repose and are exposed to prejudice as a matter of law by a suit by a late-filing plaintiff who had a fair opportunity to file within the limitations period."[98] The Court of Chancery did not consider this presumption. The court concluded instead that, even if this case had been filed after an unreasonable delay, Moelis could not suffer prejudice if required to defend this case because the facts are undisputed and thus there has been no "loss of evidence or faded memories."[99] Although the defendant raising an affirmative defense bears

---

[97] *See supra* Section III.A.

[98] *Sirius XM*, 2013 WL 5411268, at *4. *See also Stone & Paper Invs., LLC v. Blanch*, 2021 WL 3240373, at *33 (Del. Ch. July 30, 2021), *aff'd*, 312 A.3d 1155 (Del. 2024), *and aff'd sub nom*, *Skinner v. Stone & Paper Invs., LLC*, 319 A.3d 270 (Del. 2024); *Kraft*, 145 A.3d at 979 ("The Court also may presume prejudice if the claim is brought after the analogous limitations period has expired.").

[99] *Moelis I*, 310 A.3d at 1000.

the burden of satisfying each element of that defense,[100] it does not follow that, to invoke the doctrine of laches, a defendant must in all cases show that its defense of the claim at issue would be hampered by loss of evidence, faded memories, or some substantive change in the situation of the parties or property at issue.

It is an established rule that, "[u]nder ordinary circumstances, equitable claims 'will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law.'"[101]  Under this rule, "the Court will afford significant weight to an analogous statute of limitation and will presumptively bar an action filed after the limitations period."[102]  The Court of Chancery's assertion that the presence of a complete record precludes a laches defense long after the analogous limitations period has run clashed with this rule.

This is not to say that the presumption that an action is barred by laches if it is filed after the analogous statute of limitations has elapsed is irrebuttable.  Such an inflexible rule would be at odds with the very nature of equitable defenses, our precedent addressing "unusual conditions or extraordinary circumstances"[103] that might justify setting aside the analogous statute of limitations in a laches analysis,

---

[100] *Hudak v. Procek*, 806 A.2d 140, 154 (Del. 2002).

[101] 2 Wolfe & Pittinger § 15.07[d] (quoting *Reid*, 970 A.2d at 183).

[102] *Id.* (quoting *Kraft*, 145 A.3d at 979) (internal quotation marks omitted).

[103] *Levey*, 76 A.3d at 771 (quoting *IAC/InterActiveCorp. v. O'Brien*, 26 A.3d 174, 178 (Del. 2011)).

and our precedent addressing the various tolling doctrines.[104] But the equally inflexible standard applied by the Court of Chancery in this case runs counter to the maxim that "[e]quity aids the vigilant, not those who slumber on their rights."[105] Our law does not permit the maintenance of lawsuits where the plaintiff has no excuse for delay merely because the status quo of the parties or property involved has stayed the same and an adequate evidentiary record is available.

On the facts of this case, we do not believe that setting aside the analogous statute of limitations or declining to enforce the related presumption that Moelis would suffer prejudice is warranted. The "unusual conditions and extraordinary circumstances" discussed in our cases tend to focus on whether the plaintiff had been pursuing the claim during the relevant limitations period and whether there were extraneous factors such as a material change in the plaintiff's personal or financial circumstances or ongoing legal proceedings in other jurisdictions that prevented the plaintiff from bringing suit within the limitations period.[106] On this record, these factors weigh against deviating from the analogous statute of limitations. Nothing in the record suggests that the plaintiff had taken any action to pursue this claim

---

[104] *See* 2 Wolfe & Pittinger § 15.07[e][2]–[4]. An irrebuttable presumption that an action filed beyond the limitations period is time-barred is also incompatible with the related notion that equity may dictate that the Court of Chancery bar a presumptively timely lawsuit filed within the analogous limitations period. *See, e.g.*, *Houseman v. Sagerman*, 2015 WL 7307323, at *8 (Del. Ch. Nov. 19, 2015).

[105] *Reid,* 970 A.2d at 182 (citation omitted).

[106] *IAC*, 26 A.3d at 178.

during the limitations period.  Nor does the record indicate any material change in the plaintiff's financial position, ongoing legal proceedings in other jurisdictions, or the existence of any other proceedings between the parties that would render an application of the analogous statute of limitations inequitable.

None of the tolling doctrines apply either.[107]  The plaintiff was indisputably on notice of its rights before it purchased its Moelis stock because Moelis had described its governance structure in detail in its IPO prospectus as well as in numerous public filings subsequently required by federal securities law.  For good reason, there is no allegation in the complaint that Moelis acted affirmatively to conceal the facts of its governance structure.

In the laches context, "[t]he length of delay is less important than the reasons for it."[108]  Here, there is no explanation for a total delay of around nine years—six years past the analogous statute of limitations.  That being the case, we see no reason to depart from the analogous period set in § 8106 and associated presumption that Moelis would suffer prejudice if forced to defend this lawsuit.

---

[107] *See* 2 Wolfe & Pittinger § 15.07[e][2]–[4] (describing various tolling doctrines, all of which require that a plaintiff lack constructive knowledge of its claim).  *See also In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007) ("[N]o theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong.").
[108] *IAC*, 26 A.3d at 177 (citation omitted).

## E

Finally, we take seriously the Court of Chancery's concern that requiring a plaintiff who mounts a facial challenge to a stockholders agreement that clashes with a corporate board's duties under § 141(a) to do so within three years of the execution of the agreement will "insulate illegality from review."[109] But our decision today does no such thing. As a general matter, such agreements are not immune from facial challenges within the applicable limitations period. And as we have discussed, under certain circumstances that are not present here, the applicable limitations period may also yield to the demands of equity or be subject to tolling. Beyond that period, as-applied challenges may be advanced after the period for bringing facial challenges has expired. Indeed, Moelis has explicitly conceded, and we agree, that "holding plaintiff's claims of *facial* statutory invalidity to be time-barred does not prevent Moelis stockholders from bringing *as-applied* claims against the companies or its fiduciaries, based on specific circumstances that may arise in the future, challenging the enforceability of the Stockholders Agreement in those circumstances."[110]

To summarize, the plaintiff's claims for declaratory relief accrued in 2014. The plaintiff's lengthy delay in filing its complaint outside the analogous limitations

---

[109] *Moelis I*, 310 A.3d at 996.
[110] Opening Br. at 22 (emphasis in original). *See also Moelis I*, 310 A.3d at 998.

period was presumptively prejudicial, and the record does not support a finding that this presumption has been rebutted. In consequence, the Court of Chancery's denial of Moelis's motion for summary judgment was erroneous.[111]

IV

For the reasons discussed above, we reverse the Court of Chancery's judgment as reflected in its February 12, 2024 Opinion Addressing Defendant's Motion for Summary Judgment on the Basis of Laches and Ripeness and vacate its March 4, 2024 Order Implementing the Court's Rulings on the Parties' Cross-Motions for Summary Judgment and its July 18, 2024 Order Granting Plaintiff's Motion for an Award of Attorneys' Fees and Expenses.

---

[111] Because we have concluded that the plaintiff's complaint is barred by laches, we need not address the parties' respective contentions—and offer no opinion—as to the facial validity of the challenged provisions of the stockholders agreement. And because our decision eliminates the purported corporate governance benefits upon which the Court of Chancery's attorney fee award rests, we need not address Moelis's challenge to that award.